## PULLIAM INVESTMENT CO., INC., Appellant,

v.

**CAMEO PROPERTIES; Banner Equities, Inc.; Independence Construction Company; Freedom Savings and Loan Association; Independence Investment Company, Appellees.**

No. 86–1028.

United States Court of Appeals, Fourth Circuit.

Argued June 2, 1986.

Decided Feb. 9, 1987.

Rehearing Denied March 5, 1987.

K.K. Hall and Widener, Circuit Judges, concurred in part and dissented in part and filed opinion.

H. Spencer King (James C. Cothran, Jr., Spartanburg, S.C., on brief) for appellant.

Carl G. Ferguson (R. Frank Plaxco, Leatherwood, Walker, Todd & Mann, Greenville, S.C., on brief) for appellees.

Before WIDENER, HALL and SPROUSE, Circuit Judges.

SPROUSE, Circuit Judge:

Pulliam Investment Company (Pulliam) appeals from the district court's grant of summary judgment in favor of the defendants, Freedom Savings and Loan Association (Freedom), Independence Investment Company (Independence), Independence Construction Company (Construction), Banner Equities, Inc. (Banner) and Cameo Properties (Cameo), in this diversity action for breach of contract, civil conspiracy and unfair trade practices. Because we hold that genuine questions of material fact exist with respect to Pulliam's breach of contract claim, we reverse and remand to the district court for further proceedings.

## I.

Pulliam is a South Carolina corporation engaged in the development and syndication of real estate. The defendants are related entities organized under Freedom, a savings and loan association chartered by the State of Florida. Independence is a wholly-owned subsidiary of Freedom. Construction and Banner are wholly-owned subsidiaries of Independence. Cameo is a general partnership in which Banner is the sole remaining partner.

Pulliam and Banner originally formed Cameo in 1981 to acquire Wellesley Place, a large apartment complex in Columbia, South Carolina. Independence provided financing for Cameo's acquisition of Wellesley Place and apparently carried Banner's share of the property as an asset on its books. In 1983, Pulliam sold all but one percent of its interest in Cameo to Banner. In January 1984, Pulliam sold its remaining interest in Cameo to Banner in return for, among other things, a right of first refusal to purchase Wellesley Place. The right of first refusal, which is at the center of this

dispute, granted Pulliam the opportunity to acquire Wellesley Place on "the same terms and conditions as offered or afforded [a] third-party offeree." The right of first refusal was executed by Cameo, Banner, Construction and Pulliam.

During approximately the same period of time as these events, Freedom experienced substantial financial difficulties. As a result, it entered into a supervisory agreement with the Federal Home Loan Bank Board, the federal agency which regulates savings and loans, and the State of Florida in June 1984. The Bank Board required Freedom to write down the value of Wellesley Place as carried on Independence's books by over $2,300,000. In order to avoid the loss which would result from such a write down, Freedom decided to sell Wellesley Place. Freedom contacted an individual investor, Lawrence Malanfant, to ascertain his interest in purchasing the property. Malanfant, a Freedom customer known for buying troubled real estate and achieving successful results, had previously approached Freedom to obtain financing for the purchase of a large parcel of unimproved real estate in California. Although Freedom had initially decided against financing that purchase, it now proposed to Malanfant that Freedom would finance Malanfant's purchase of the California property if Malanfant would agree to purchase Wellesley Place.

Malanfant expressed interest in Freedom's proposal and sent employees to South Carolina to inspect Wellesley Place. Both parties needed to reach an agreement quickly since Malanfant's option to purchase the California property would expire on November 21, 1984 and Freedom had to dispose of Wellesley Place prior to the end of 1984 to avoid writing it down. On October 9, 1984, Malanfant wrote Freedom that he would purchase Wellesley Place if Freedom would provide financing for that purchase, the purchase of the California property, and the purchase of some condominiums in Arizona.[1] Several officers of Freedom then met with Malanfant in Arizona and, after inspecting the California property, agreed in principle to loan Malanfant the funds necessary to purchase both the California property and Wellesley Place. Freedom retained counsel in California to draft the loan agreement.

On October 17, 1984, Malanfant submitted a formal offer to Freedom to purchase Wellesley Place for $7,000,000. Independence responded to Malanfant with a counteroffer. On October 23, 1984, Malanfant, his wife, Cameo and Banner executed a contract for sale of Wellesley Place. The contract named Independence as a "seller", although its agents did not sign the agreement. The contract provided for a purchase price of $7,000,000, payable by Malanfant in cash at the closing.

Independence retained counsel in Columbia, South Carolina to represent it in connection with the sale of Wellesley Place. On October 25, 1984, Independence's attorney, Robert G. Currin, Jr., sent Pulliam a copy of the contract to sell Wellesley Place to Malanfant. Currin requested that Pulliam reply by November 14, 1984, as to whether it intended to exercise its right of first refusal to purchase the property on the same terms as set forth in the Malanfant contract. Pulliam was later given until November 25, 1984 to exercise its right. The contract sent to Pulliam, of course, provided that Malanfant would pay cash for Wellesley Place.

Freedom's counsel in California sent Currin a copy of the final draft of the loan agreement between Freedom and Malanfant on November 19, 1984. The agreement provided that Freedom would loan Malanfant $15,900,000 to be used as follows: (a) $5,100,000 to purchase the California property; (b) $7,000,000 to purchase Wellesley Place; (c) $3,060,000 to be retained by Freedom to make Malanfant's interest payments; and (d) the balance for loan fees and costs. The term of the loan

---

1. Because there were no time constraints regarding Malanfant's purchase of the condominiums in Arizona, that transaction was handled separately and has no effect on the dispute in this case.

was for two years with interest payable monthly at an annual rate of 13%. At the end of the two years, Malanfant could renew the loan for an additional year by paying a fee of 0.5% of the then outstanding principle balance. Freedom received a loan fee of $238,500 and a 25% profit participation in the development of the California property. As security for the loan, Malanfant gave Freedom a deed of trust on the California property, which had an appraised value of $26,000,000, and a $3,500,000 first mortgage on Wellesley Place. In addition, Malanfant and his wife were personally liable for the full amount of the loan, and Malanfant assigned a $1,000,000 life insurance policy to Freedom. Malanfant and Freedom executed the loan agreement on November 21, 1984, the same day Malanfant closed his purchase of the California property.

Upon learning that Freedom was providing financing for Malanfant's purchase of Wellesley Place, Currin contacted Freedom and recommended that it disclose all of the details of the transaction to Pulliam. Currin and Freedom also decided that Freedom should offer Pulliam the same financing for the purchase of Wellesley Place as it had offered Malanfant. Currin made this disclosure and offer to Pulliam in a letter on November 21, 1984. The letter stated that the California and Wellesley Place transactions were "intimately intertwined, and it is difficult, if not impossible, to separate one from the other." It summarized the terms of Freedom's loan to Malanfant, including the provision that as collateral Malanfant would provide Freedom with a first lien position on the California property worth $26,000,000 and on Wellesley Place worth $3,500,000. The letter concluded with the request that if Pulliam was "prepared to offer Freedom collateral of equal or similar value, under the same terms and conditions offered and afforded" Malanfant, it should notify Currin within twenty-one days of its exercise of its right of first refusal.

On November 27, 1984, Pulliam's counsel requested that Currin furnish copies of the actual documents comprising the transactions between Malanfant and Freedom or its subsidiaries and that he explain the inconsistencies between the latest disclosure and his earlier notice. Freedom took the position, however, that Florida law prohibited disclosure of the loan agreement without Malanfant's consent, which he apparently refused to give. Currin advised Pulliam's counsel on November 30, 1984 that Freedom was unable to produce the loan agreement, but maintained that the terms of the agreement were accurately reflected in his letter of November 21, 1984. Currin reminded Pulliam's counsel that Pulliam's right of first refusal would expire on December 13, 1984.

There was no further contact between the two sides regarding Pulliam's right of first refusal. On December 31, 1984, Malanfant closed his purchase of Wellesley Place. Freedom credited Independence's intra-company account with $6,800,000 in funds from the earlier loan to Malanfant. The remaining $200,000 of the purchase price of Wellesley Place was held in escrow and later divided between Malanfant and Independence. Freedom received a $3,500,000 first mortgage on Wellesley Place, which it recorded on May 13, 1985.

Pulliam subsequently brought this action against the defendants alleging that they had breached its right of first refusal, had conspired to breach its right of first refusal, and had engaged in unfair trade practices in violation of the South Carolina Unfair Trade Practices Act, S.C.Code Ann. § 39–5–20 (Law. Co-op. 1985). Following extensive discovery by Pulliam, the defendants moved for summary judgment on all of Pulliam's claims. The district court found that Currin's letter of November 21, 1984 unambiguously set out the terms of Freedom's loan to Malanfant and offered financing on those same terms and conditions to Pulliam. The court ruled that since the defendants had complied with the provisions of the right of first refusal, Pulliam could not establish a breach of the contract, a conspiracy to breach the contract, or an unfair trade practice. The

court granted summary judgment for the defendants, and Pulliam appealed.

## II.

Summary judgment is proper only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts. *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir.1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir.1950). The party seeking summary judgment carries the burden of showing that there is no genuine issue as to any material fact in the case. Fed.R. Civ.P. 56(c); *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979). When determining whether the movant has met its burden, the court must assess the documentary materials submitted by the parties in the light most favorable to the nonmoving party. *Gill v. Rollins Protective Services Co.*, 773 F.2d 592, 595 (4th Cir.1985).

The critical inquiry in this case is whether the defendants gave Pulliam the opportunity to acquire Wellesley Place on the same terms and conditions as they provided Malanfant. The answer to that question of fact lies primarily in Currin's November 21, 1984 letter to Pulliam. The district court found that Currin's letter was an unambiguous offer to sell Wellesley Place to Pulliam on the same terms and conditions as the proposed sale to Malanfant. We disagree. We believe the letter is ambiguous as to the amount of financing Freedom offered Pulliam and the amount, value and type of collateral Pulliam had to provide in order to exercise its right of first refusal.

Currin summarized the terms of the forty-one page loan agreement between Freedom and Malanfant in two pages of his letter and concluded: "[i]f, within the next 21 days, you are prepared to offer Freedom collateral of equal or similar value, under the same terms and conditions offered and

afforded this bona fide third party (Malanfant)," Pulliam should give Currin written notice. In summarizing the terms of the loan, however, Currin stated that Freedom had "agreed to lend Malanfant $15,900,000, of which $7,000,000 will be used by Malanfant to purchase Wellesley Place from Independence. The balance of the loan proceeds will be used by Malanfant for purposes not related to Wellesley Place." Thus, it is not at all clear whether Freedom was offering Pulliam a similar loan of $15,900,000 or a loan of only the $7,000,000 necessary to purchase Wellesley Place.[2]

Currin further related that as collateral for the loan, Freedom would receive from Malanfant a first lien position on a tract of land in California with an appraised value of $26,000,000 and a first lien position in the amount of $3,500,000 on Wellesley Place. The letter noted that Freedom would receive a 25% profit participation in the California property and that the Malanfants, with a personal net worth in excess of $12,000,000, would personally guarantee the loan. Once again, it is not clear whether Pulliam was required to purchase an additional tract of land, provide security totalling over $40,000,000, and grant Freedom a 25% profit participation in the development of land valued at $26,000,000, or whether the Wellesley Place portion of the transaction was to be separated and offered to Pulliam as a $7,000,000 loan secured in part by a $3,500,000 lien on the property.

The documentary materials submitted by the parties shed no light on the ambiguities in Currin's letter. Currin stated in his deposition that he drafted the final version of the letter "to eliminate any requirement that Freedom [sic] Investment Company would have to come up with a piece of property in California, or some other state, with an appraisal value of $26,000,000, because I just didn't think that was a valid demand for us to make." When asked exactly what the letter required Pulliam to

---

**2.** Currin's letter failed to inform Pulliam that over $3,000,000 of the loan to Malanfant would be retained by Freedom to make Malanfant's monthly interest payments. Thus, the letter

gives the impression that Pulliam would have to come up with additional funds to meet the monthly interest payments if it exercised its right of first refusal.

provide in order to exercise his right of first refusal, Currin replied:

> Currin: What I was saying to him, if you can come up with a similar deal—which is what I was told to tell him.
>
> Question: Well, I'm asking you, similar to what?
>
> Currin: Similar to what Malanfant had come up with. In other words, see, Freedom was all excited because they had this collateral in California that they were going to get an equity participation in ... that was going to give them potential for significant income from that property.

Rather than clarify the intent of the letter, Currin's statements only create further doubt as to what Pulliam had to provide in the way of collateral. It is impossible to discern from his testimony whether he referred to collateral which exceeded the value of Wellesley Place and provided Freedom an opportunity for profit participation.

At approximately the time that he wrote the November 21, 1984 letter to Pulliam, Currin also prepared documents to be used in the event Pulliam exercised its right of first refusal to purchase Wellesley Place. Because he was unsure of the amount of the loan Freedom would give Pulliam and the amount of the mortgage that would be placed on Wellesley Place, Currin prepared two sets of documents: a promissory note and mortgage each in the amount of $7,000,000 and another promissory note and mortgage each in the amount of $3,500,000. Under the terms of the loan to Malanfant, however, the loan and promissory note were for $15,900,000 and the mortgage on Wellesley Place was for $3,500,-000. This variance is further indication of the ambiguity as to whether Freedom was offering to sell Wellesley Place to Pulliam on the same terms as it offered Malanfant.

We believe, therefore, that genuine issues of fact existed concerning what the defendants offered to Pulliam through Currin's letter and that the district court erred in granting summary judgment for the defendants on Pulliam's breach of contract claim.[3] We agree, however, with the district court's conclusion that the defendants were entitled to summary judgment on Pulliam's conspiracy and unfair trade practices claims. There is nothing in the record from which a trier of fact could reasonably infer that the defendants intentionally structured their transaction with Malanfant in order to defeat Pulliam's right of first refusal. To permit the inference of a conspiracy between the defendants from the documentary materials in the record would cross the line "between reasonable inferences and mere speculation." *Terry's Floor Fashions, Inc. v. Burlington Industries, Inc.*, 763 F.2d 604, 611 (4th Cir.1985). Similarly, there is nothing in the record which might tend to show that the defendants engaged in "[u]nfair methods of competition and unfair or deceptive acts or practices" in violation of the South Carolina Unfair Trade Practices Act, S.C.Code Ann. § 39–5–20 (Law. Co-op. 1985). *See United Roasters, Inc. v. Colgate-Palmolive Co.*, 649 F.2d 985, 992 (4th Cir.) (construing identical North Carolina statute to prohibit something more than ordinary breach of contract), *cert. denied*, 454 U.S. 1054, 102 S.Ct. 599, 70 L.Ed.2d 590 (1981); *see also Clarkson v. Orkin Exterminating Co.*, 761 F.2d 189 (4th Cir.1985).

In sum, we reverse the district court's grant of summary judgment to the defendants on Pulliam's breach of contract claim. We affirm the court's grant of summary judgment to the defendants on Pulliam's conspiracy and unfair trade practices

---

**3.** The defendants contend that they did not have to offer any financing to Pulliam to comply with the right of first refusal because the sale of Wellesley Place to Malanfant was in fact a cash sale as to Independence, Banner and Cameo since Freedom, which provided the financing, was not a party to the right of first refusal or the contract to sell the property. Pulliam argues that Freedom was required to offer it the same financing as Freedom offered Malanfant because Independence, Banner and Cameo are all wholly-owned by Freedom and because Freedom made the decision to sell Wellesley Place, found a buyer, negotiated the sale and offered financing in order to make the sale. The district court accepted Pulliam's position for purposes of deciding the motion for summary judgment, and we will do the same.

claims.[4] We remand the case to the district court for further proceedings not inconsistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

HALL, Circuit Judge, concurring in part and dissenting in part:

I concur in that portion of the majority's opinion which affirms the district court's entry of summary judgment in favor of defendants on Pulliam's claims of conspiracy and unfair trade practices. I cannot agree, however, with the majority's conclusion that the district court erred in granting summary judgment for defendants on Pulliam's breach of contract claim. In my view, the district court correctly found that defendants had adequately complied with the provisions of the right of first refusal. As the district court observed:

> All that the signatory defendants agreed to do is (1) give Pulliam notice in writing of any sale of Wellesley Place and (2) afford Pulliam the opportunity to purchase that project upon the same terms and conditions as offered or afforded the third-party offeree. Said defendants were under no obligation to provide Pulliam with any advance notification that they were negotiating with or entering into a sales agreement with a third party, sell or not sell the property in any particular manner, or provide financing on the sale of the project. Conversely, if the property owners or their parent corporation were able to obtain a highly advantageous loan with very valuable collateral as security incidental to the disposition of this property, they

would be entitled to the same from Pulliam.

*Pulliam Investment Co., Inc. v. Cameo Properties,* C/A No. 7:85–683–3 (D.S.C. December 30, 1985), slip op. at 12.

The district court found that Pulliam is a sophisticated and experienced commercial concern which had a history of structuring complicated real estate transactions involving complex financing. After receiving the detailed disclosure and offer recited in Currin's letter of November 21, 1984, Pulliam never responded with a loan request or any proposal to test whether Wellesley Place would have been sold to it without the type of property in California that Malanfant was offering as collateral. Rather, as the district court correctly noted, Pulliam simply waited for someone to get back to it and offer more than 100% financing. Under these circumstances, even if Currin's letter was, as the majority finds, ambiguous, Pulliam should not be given the benefit of any purported ambiguity. I agree with the district court that if anyone here failed to comply with the right of first refusal, it was Pulliam itself rather than any of the defendants. Accordingly, I conclude that the district court properly entered summary judgment against Pulliam on its breach of contract claim and would affirm the decision below in its entirety.

WIDENER, Circuit Judge, concurring and dissenting:

I

I concur in all of the majority opinion with respect to the breach of contract claim

---

4. The panel agrees unanimously that the district court correctly entered summary judgment on the unfair trade practices claim. As Judge Widener notes in his separate concurring and dissenting opinion, he also agrees that the district court erred in granting summary judgment on the breach of contract claim. He dissents to the majority holding that there was no genuine issue of fact relating to the civil conspiracy. Judge Hall, on the other hand, in his concurring and dissenting opinion, feels that the lower court correctly granted summary judgment both on the breach of contract and conspiracy claims and would affirm the decision below in its entirety. A majority of the panel consisting of Judge Widener and Judge Sprouse thus hold that the contract issue was incorrectly decided and a majority of the panel consisting of Judge Hall and Judge Sprouse hold that the conspiracy issue was correctly decided. All agree that the unfair trade practice issue was correctly decided.

and to the claim under the South Carolina Unfair Trade Practices statute.

With respect to the conspiracy claim, however, I would deny summary judgment. As to that aspect of the case, I respectfully dissent.

### II (Conspiracy Claim)

When Freedom decided to tie to the lucrative California transaction, to which Pulliam was not a party, the purchase of Wellesley Place and then refused as it did to tell Pulliam upon precisely what conditions it (Freedom) would sell Wellesley Place to Pulliam, that leaves a permissible inference of fact that Freedom was so anxious to get rid of Wellesley Place and to participate in the California transaction at the same time, that it structured the whole transaction to make it more difficult for Pulliam to comply than if it had simply offered Wellesley Place to Pulliam. At least that is what I believe our position should be at this stage of the proceeding when we must not weigh the evidence nor judge the credibility of witnesses except in the most unusual circumstances not present here.

### III (Breach of Contract Claim)

While I concur, as I have previously noted, in the majority opinion and in the result on the breach of contract claim, I would add a word. I think that it will take a lot of explaining by Freedom not presently in this record as to why it did not either offer Wellesley Place to Pulliam for $7,000,000 cash, he to arrange his own financing, or offer Wellesley Place to Pulliam for $7,000,000 cash, Freedom to furnish $3,500,000 of the financing. On trial, if there is no additional evidence in the record with respect to the breach of contract, I would give judgment to Pulliam, otherwise Freedom and its allied business associates have escaped scot-free from a right of refusal voluntarily given in good faith for valuable consideration and memorialized by formal written agreement.