UNITED STATES of America,
Plaintiff–Appellee,

v.

3809 CRAIN LIMITED PARTNERSHIP; Bertram L. Potemken, personal representative of the Estate of Armstead S. Wayson; Kenneth A. Wayson; David S. Wayson; Bertram L. Potemken, Trustees, of the Armstead; Margaret Wayson Trust; Rip's, Inc.; Rip's Motel, Inc.; Bertram L. Potemken; Kenneth A. Wayson; David S. Wayson; Larue Wayson Dillon, (formerly Larue Wayson Riva); First National Bank of Southern Maryland, Defendants–Appellants,

and

Stanley S. Kwiatowski; Ann Kwiatowski; Sharon Savings & Loan Association; Baltimore Federal Savings and Loan Association, Defendants.

No. 88–2213.

United States Court of Appeals,
Fourth Circuit.

Argued June 9, 1989.

Decided Sept. 1, 1989.

Rehearing and Rehearing In Banc
Denied Oct. 2, 1989.

Calvin Carl Curtis (James I.K. Knapp, Acting Asst. Atty. Gen., Gary R. Allen, David English Carmack, Tax Div., Dept. of Justice, Washington, D.C., Breckinridge L. Willcox, U.S. Atty., Baltimore, Md., on brief), for plaintiff-appellee.

Before PHILLIPS and WILKINS, Circuit Judges, and WILLIAMS, United States District Judge for the Eastern District of Virginia, sitting by designation.

PHILLIPS, Circuit Judge:

This is the second appeal in the government's continuing attempt to collect the unpaid estate tax liability of Armstead Wayson, who died in 1974. The principal question before us now is whether the district court properly granted summary judgment for the government, determining that its tax lien had priority over a deed of trust held by the First National Bank of Southern Maryland (First National) on estate property sold at foreclosure to the intervening defendant-appellant herein, 3809 Crain Limited Partnership (Crain).[1] Having concluded that the district court's disposition was proper, we affirm.

I

Armstead Wayson died testate in 1974. Under his will, certain property passed to a trust, the beneficiaries of which were his children. One of these pieces of property—a tract of about 80 acres of land with several commercial buildings in Prince George's County, Maryland (the PG property)—is at the center of this case. It is undisputed that the government acquired a general tax lien enforceable under 26 U.S.C. § 6321 on the PG property. It is also undisputed that First National subsequently acquired a deed of trust on the same property. The question before us now is, on the peculiar facts of this case, which of these two interests takes priority under the Internal Revenue Code.

Frederick Rahde Franke, Jr., Annapolis, Md., for defendants-appellants.

1. After the first purchasers defaulted, and the bankruptcy court approved the sale to the second purchasers, Charles H. Bassford and C. Carroll Lee, the second purchasers transferred ownership to the partnership they controlled, 3809 Crain Limited. *See* Joint Appendix at 156–58.

On February 25, 1976, the government fixed the Wayson estate's tax liability at more than $323,000 and made a demand for payment. After the estate failed to pay more than only a small portion of the then-determined $501,947.32 outstanding, which included deficiency assessments, the general tax lien arose automatically under 26 U.S.C. § 6321, encumbering the PG property. Later, on December 1, 1978, the trustees of the Wayson trust applied for a mortgage on the PG property from First National. The bank approved the $1.2 million loan on the condition that the proceeds would be used in part to pay the estate taxes. Before the loan transaction was completed, however, First National learned that two of the trustees (David and Kenneth Wayson, who were Armstead Wayson's sons) were engaged in an assumed check-kiting scheme[2] involving First National and the checking accounts of Rip's, Inc., and East Central Distributors, the operating entities of the Wayson trust. David Carroll 1, a North Carolina sporting goods manufacturer and distributor, mailed large checks drawn on his business account, which lacked sufficient funds to cover the checks, to the Wayson brothers, who then deposited the checks in the operating entities' accounts. The Wayson brothers then wrote their own business checks to Carroll 1 in North Carolina, drawing upon the checking account balances—which were on paper only—created by the deposit of Carroll 1's earlier check to them. Carroll 1 then cashed the Wayson brothers' checks at his own bank, completing the loop.[3] When Carroll 1's bank discovered the scheme during an audit, it froze his account, refusing to honor any of his outstanding checks. By that time, however, the operating entities' checking accounts were overdrawn by more than $3 million.

In an attempt to minimize its losses, First National immediately canceled its mortgage loan agreement with the Wayson trustees. The overdraft nevertheless left First National over its legal unsecured lending limit and federal authorities threatened to close the bank for the protection of its customers. David and Kenneth Wayson were also threatened with criminal prosecution.

On March 5, 1979, the Wayson brothers in their individual capacities, Rip's Inc., and East Central Distributors, entered into a promissory agreement with First National, acknowledging their $3 million liability to the bank and promising its repayment. The Wayson brothers and Bertram Potemken, as trustees of the Wayson trust, joined the promissory agreement as guarantors of the debt and simultaneously executed the deed of trust on the PG property as security for the guarantee.[4] In exchange for this promissory agreement and secured guarantee, which prevented First National's closure by federal officials, the bank agreed not to seek immediate repayment from or criminal prosecution of the Waysons, but to instead seek repayment first from Carroll 1. On July 7 and December 27, 1980, the government filed in Prince George's County notices of its tax lien on the PG property.

Although First National was able to collect approximately $980,000 from Carroll 1, reducing the overdraft to $2.1 million, it was unable to collect any more from Carroll 1 or the Wayson interests. Consequently, on November 20, 1981, the bank began foreclosure proceedings on the deed of trust, naming as defendants the Wayson

**2.** Although criminal charges were never brought against David or Kenneth Wayson, the executor of the Wayson trust testified at his deposition that, to "the best of [his] recollection," David Carroll was indicted for his involvement in the scheme and was eventually convicted of bank fraud. App. at 189–90.

**3.** Although the president of First National characterized this at deposition as a "check kiting scheme," David Wayson maintains that the method was a legitimate means of allowing the Wayson trust operating entities, which were

sporting goods distributors, to acquire more inventory from Carroll's business than they otherwise would have been able to afford during their slow season. Perhaps for lack of a better descriptive term, we will refer to the money lost by First National as an "overdraft."

**4.** Bertram Potemken, as executor of the Wayson trust, first transferred the PG property from the trust to the Wayson brothers and himself as trustees.

trust, its trustees, and Rip's, Inc., which operated the PG property. The defendants then petitioned the Prince George's County Circuit Court to set aside the deed of trust on the ground that it was obtained by fraud and duress. They claimed in particular that First National misrepresented certain facts and threatened David Wayson with criminal prosecution. The County Court subsequently dismissed the petition, however, finding no evidence to support the allegations.

Sometime in early 1982, Rip's, Inc. filed for voluntary bankruptcy under Chapter 11 of the Bankruptcy Code. Toward the end of April of the same year, the Wayson trust also declared bankruptcy. Thereafter, on September 15, 1982, the government sought to foreclose both on the special 10–year estate tax lien that arose upon Armstead Wayson's death and attached to all of his property pursuant to 26 U.S.C. § 6324, and on the general tax lien that arose pursuant to 26 U.S.C. § 6321 at the time of demand and nonpayment. The government's foreclosure proceedings were stayed, however, until Rip's bankruptcy proceedings were concluded, and remained administratively closed for two years. During this period, First National sold the PG property at public auction pursuant to a power of sale in the deed of trust. After the government's foreclosure proceedings resumed and several preliminary complications were resolved, the district court granted the defendants' motion for summary judgment. On appeal, this court reversed, concluding that although the government could not foreclose on its 10–year estate tax lien, it had given adequate notice of its intent to foreclose on the general tax lien under § 6321. *United States v. Potemken*, 841 F.2d 97 (4th Cir.1988). On remand, Crain, as intervening defendant, and the government both moved for summary judgment on various grounds. Holding for the government, the district court concluded that First National's deed of trust was not a "security interest" under § 6323(a) of the Code. 700 F.Supp. 279 (D.Md.1988). Crain's interest in the PG property, as successor to First National's interest, was therefore subordinate to the

government's claim. In turn, the court ordered foreclosure of the general tax lien. In denying Crain's subsequent "Motion for Alteration of Judgment," the court clarified that the deed of trust did not rest on past consideration, which Crain describes as the Bank's "extension of credit" to the Wayson brothers, "but upon [contemporaneous] forbearance from prosecution and other fresh *nonmonetary* consideration."

This appeal followed.

## II

In reviewing the grant of summary judgment in this case, we apply the same standard that guided the district court, and assess all of the forecast of evidence submitted by the parties, in the light most favorable to the non-moving party. *Pulliam Investment Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir.1987) (citing *Gill v. Rollins Protective Serv. Co.*, 773 F.2d 592, 595 (4th Cir.1985)). Summary judgment is appropriate only when it is "perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law." *Gill*, 773 F.2d at 595 (quoting *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir.1950)). It is therefore warranted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

## III

Section 6321 of the Internal Revenue Code provides for the imposition of a general tax lien in favor of the government against property owned by any taxpayer who is determined liable to pay taxes but neglects or refuses to do so. 26 U.S.C. § 6321. *See also Air Power, Inc. v. United States*, 741 F.2d 53, 54 (4th Cir.1984). This tax lien arises automatically at the time payment of the assessed amount is demanded and continues in force thereafter until the underlying tax liability "is satisfied or becomes unenforceable by reason of

lapse of time." *Id.* § 6322. If an asserted claim is a "security interest" within the meaning of the Tax Code, it takes priority if it is created before the government properly files its tax liens. *Id.* Section 6323(h) provides that a security interest exists for priority purposes when the party's asserted interest has been perfected under local law *and* "to the extent that ... the holder [of the purported security interest] has parted with money or money's worth." The relevant regulation defines "money or money's worth" as

> money, a security ..., tangible or intangible property, services, and other consideration reducible to a money value. Money or money's worth also includes any consideration ... which was parted with before the security interest would otherwise exist if, under local law, past consideration is sufficient to support an agreement giving rise to a security interest.... [A]ny other consideration not reducible to a money value [is not] consideration in money or money's worth.

Treas.Reg. § 301.6323(h)-1(a)(3) (1989).

■ Because the government's general tax lien on the PG property arose automatically upon notice and demand in 1976, it takes priority over First National's deed of trust executed in 1979, *unless* the deed of trust qualifies as a security interest under the Tax Code. If it qualifies as such, the deed takes priority because it was executed before the government filed its 1980 tax lien in Prince George's County. As recognized by the district court, because the deed was properly recorded under local law and was therefore "perfected," the only question to be resolved is whether First National, as initial holder of the deed of trust on the PG property, parted with "money or money's worth" in exchange for the deed. If it is beyond dispute that First National did *not* part with such, then it does not have a qualifying security interest in the PG property and the government is entitled to summary judgment as a matter of law.

## IV

■ The record in this case, as Crain apparently concedes, makes it clear that

First National did not *contemporaneously* exchange anything reducible to money or money's worth as consideration for the deed. The Wayson trust executor testified at his deposition that he signed the deed of trust in return for the Wayson brothers not being prosecuted. App. at 197–98. Kenneth Wayson testified that he and his brother signed the promissory note, which was secured by the deed of trust, even though they had not received any of the overdrawn funds, because the federal authorities required the bank to do so, and he and his brother were still "trying to work with the bank." *Id.* at 225–26. David Wayson agreed that the note was signed to "help the bank," and to keep it from "going under." *Id.* at 308, 315. He also testified that First National required the deed of trust as security in exchange for seeking initial repayment from the accounts receivable of the North Carolina business, rather than from the Waysons themselves. *Id.* at 310, 311. Additionally, in the Waysons' 1982 action to enjoin First National's sale of the PG property and to set aside the deed of trust on the ground that it was obtained by fraud and duress, the Maryland Circuit Court rejected the Wayson's argument that the deed failed for want of consideration and identified the consideration upon which the deed rested as: (1) the commercial benefit the Waysons received by enabling First National to remain in operation, and (2) the personal benefit they received by avoiding criminal prosecution. *Albright v. Rip's, Inc.*, No. E11, 118–18 (Prince George's County Cir. Ct. September 22, 1982) (transcript of oral opinion, App. at 379).

Appellants argue, however, that even though First National did not contemporaneously exchange value reducible to money or money's worth for the deed of trust, the deed was a security interest within the meaning of § 6321 because First National's several million dollar "extension of credit" constituted qualifying past consideration under Maryland law. Treas.Reg. § 301.6323(h)-1(a)(3) (past consideration can create a security interest if it "otherwise would constitute money or money's worth

[and] if, under local law, past consideration is sufficient to support an agreement giving rise to a security interest."). *See also* S.Rep. No. 1708, 89th Cong., 2d Sess., *reprinted in* 1966 U.S.Code Cong. & Admin. News 3722, 3734. We disagree.

While we might be inclined, if necessary, to rule that funds gained illegally in this manner could never serve as the consideration for a subsequently performed act, we need not reach that question here. The undisputed evidence in this case shows that the deed of trust was granted to First National by Bertram Potemken, and by David and Kenneth Wayson *in their capacity as trustees of the Wayson trust*, as security for their guarantee of repayment of the "overdraft" amount by Rip's, East Central Distributors, and David and Kenneth Wayson *in their individual capacities.*[5] It is clear to us then that, if construed as consideration at all, the lost $3 million serves to support the primary promise to repay by Rip's, East Central Distributors and the Wayson brothers individually. The trustees' additional promise to serve as guarantors of the repayment, secured by the deed of trust, is supported, we think—as the evidence described above indicates and as both courts to consider the question have concluded—by the independent consideration of First National's forbearance from prosecution and its arrangement to seek repayment from Carroll first.

While it certainly is true that First National, the holder of the purported security interest, "parted with money or money's worth," there is no evidence to show that the deed of trust was given as any sort of reciprocation. Although the statute does not expressly require that the holder of the purported security interest part with money or money's worth *in exchange for* the security interest, we are convinced that the separate acts—the act allegedly constituting the past consideration and the act granting the "security interest"—must be more than circumstantially related. The applicable regulations discuss "money or money's worth" in terms of "consideration," indicating that, as generally true in contract law, the reciprocating performance must be made in consideration of, *i.e.,* in a bargained exchange for, the former act. Other than appellants' continued assertion that the trustees' grant of the deed of trust rests on what the appellant characterizes as First National's prior "extension of credit," there is no evidence in the record to support this view. Of course, the trustees would not have granted the deed of trust if First National had not lost the $3 million, but this merely circumstantial relationship does not suffice.

Similarly, the $3 million plus "overdraft" does not constitute qualifying past consideration under Maryland law. In Maryland, a new promise cannot be based on past consideration unless there was an understanding at the time the "consideration" was extended that there would be some repayment or other performance on the part of the purported promisor. Md. Law Encycl., Contracts § 80.[6] Although appellants point to two sources of such an "understanding" between the Wayson interests and First National, neither satisfies the requirement. The fact that the checking accounts of Rip's, Inc., and East Central Distributors, which served as the vehicles for the alleged check-kiting scheme,

---

**5.** The guarantee agreement contained within the promissory agreement provides that:

    KENNETH A. WAYSON, DAVID S. WAYSON and BERTRAM L. POTEMKEN, Trustees of the Armstead and Margaret Wayson Trust, established under the Last Will and Testament of Armstead S. Wayson, hereby guarantee to [FIRST NATIONAL], the payment of all sums set forth herein, and as security for said guarantee agree to execute simultaneously herewith a deed of trust giving [FIRST NATIONAL], a lien [on the described property] in the amount of [the] indebtedness....

    App. at 40.

**6.** While we do not dispute Maryland's early recognition of several exceptions to this "understanding" requirement, *see, e.g., Ellicott v. Peterson,* 4 Md. 476 (1853) (noting that where a party is under a legal and equitable obligation to pay a debt, the law implies a promise though none was ever actually made), we question appellants' assertion that they are applicable here. The grantors of the deed of trust, the Wayson brothers and Potemken, all acting in their capacities as trustees of the Wayson trust, were *not under an obligation to pay the debt in that capacity.*

are evidenced by signature cards that require repayment of overdrafts is not helpful. Both cards were signed only by David and Kenneth Wayson either in their individual capacities or in their capacities as company officials.[7] Any "understanding" concerning repayment then, assuming we accept appellants' argument that this could constitute such,[8] could only be between the Wayson brothers, Rip's, East Central Distributors and First National. Nothing suggests that, in the eventuality of an overdraft, First National *"understood"* that it could seek repayment from the trustees of the Wayson trust.

Appellants' second source of "understanding" fails for a similar reason. They claim that because Maryland law requires repayment by drawers of overdrafts, *see* Md.Code Ann. § 4–401(1) & commentary; *see also* Bailey, *Brady on Bank Checks* § 18.3, at 18–5 (6th ed. 1987) ("The drawing of a check by a depositor in a sum greater than the amount he has on deposit in itself implies a promise on the part of the depositor to repay to the bank that amount by which the account is overdrawn, and the bank may maintain an action to recover that amount."), there was an "understanding" between the Wayson brothers (both individually and as representatives of Rip's and East Central Distributors) and First National that they would repay the money. Again, however, while this understanding might render the bank's losses past consideration for the Wayson's subsequent promise to repay, it does not render the loss a generic past consideration capable of supporting any later act.[9]

The fundamental flaw then in nearly all of appellants' arguments is the attempt to connect questionable past consideration, which (excluding Carroll 1) arguably benefited only the Waysons and the two businesses, to the Wayson trustees' independent agreement to guarantee repayment and to secure the guarantee in part with a deed of trust on the PG property. The evidence clearly establishes that this independent agreement was given in exchange for First National's forbearance from prosecution and its agreement to seek repayment first from Carroll. As neither of these benefits is reducible to "money or money's worth," First National's deed of trust cannot qualify as a "security interest" within the meaning of the Tax Code and therefore cannot take priority over the government's general tax lien.

V

Having concluded that appellants could not establish that the deed of trust rose to the level of a security interest under the Code—an essential element of their claim— and finding Crain's subsidiary arguments without merit, we conclude that summary judgment for the government was proper and therefore affirm.[10]

AFFIRMED.

---

**7.** A third card for the account of "Rip's, Inc., T/A Rip's Liquor Wine N Cheese Shoppe" also bore the signatures of Thelma A. Wayson and Gordon F. MacPherson.

**8.** The language on the account cards pertaining to repayment of overdrafts seems more limited than appellants suggest. It reads: "This Bank may charge back at any time prior to midnight on its business day next following the day of receipt, any item drawn on the Bank which is ascertained to be drawn against insufficient funds or otherwise not good or payable." *See also Riggs v. State,* 367 A.2d 22, 26 n. 5, 34 Md.App. 324 (1976) ("Although a depository bank may provisionally settle with its customer,

by extending credit while a deposited check is in the process of collection, thereby reserving its right of charge-back or refund, once the payor bank pays the item in cash, it is deemed to be final payment and the right of charge-back or refund is lost.") (citations omitted).

**9.** Appellants also argue that the promissory agreement to repay satisfies the "understanding" requirement. As this agreement was entered into only after the overdraft was discovered, we are not sure how it helps appellants' case.

**10.** Because First National's deed of trust is not a security interest within the meaning of the Code, it is junior in priority to the government's

lien. We therefore need not consider Crain's argument that First National's foreclosure sale, which was preceded by notice to the government, discharged the tax lien, giving foreclosure purchasers and subsequent takers (*i.e.,* Crain Ltd.) clear title. Foreclosure sales do not discharge superior liens. Crain contends, however, that, in our earlier opinion in this case, we held that the general tax lien was an "inferior" lien, which would now make it subject to discharge at a foreclosure sale of which Crain receives notice. *See* 26 U.S.C. § 7425(b)(2). In using the word "inferior" to describe the general assessment tax lien that arose under § 6321, we were comparing that lien to the "superior" § 6324 liens that survive for 10 years. *Potemken,* 841 F.2d at 102. Obviously we were not purporting to relegate the general tax lien to a position inferior to other parties' interests, but only to its sister lien that arose under § 6324.