**EASTON NISSAN, INC., Plaintiff,**

v.

**FORD MOTOR CREDIT COMPANY, Defendant.**

**Civ. A. No. R–89–2289.**

United States District Court, D. Maryland.

Jan. 4, 1991.

Harry M. Walsh, Jr., Walsh & Phillips, Easton, Md., for plaintiff.

Robert J. Thieblot, Thieblot, Ryan, Martin & Ferguson, Baltimore, Md., for defendant.

## MEMORANDUM AND ORDER

RAMSEY, District Judge.

Pending before the Court in the above-captioned case is a motion for summary judgment filed by defendant-counter-plaintiff Ford Motor Credit Company [Ford]. Ford requests judgment in its favor on the claims filed against it by plaintiff Easton Nissan, Inc. [Easton] and also on the counterclaims which Ford has asserted against Easton. The motion has been fully briefed and is ripe for consideration. For the reasons discussed below, the motion shall be granted.

### I. INTRODUCTION

This suit arises out of Maryland Vehicle Retail Installment Contracts entered into by Easton and its customers (individuals not involved in this action) which contracts were subsequently assigned to defendant Ford. In those contracts, it was Easton's practice to characterize dealer rebates as "cash down payments." Alleging that this practice was a breach of warranties contained in the assignment agreement between Easton and Ford, Ford forced Easton to repurchase several of the installment contracts.

Plaintiff brought suit for the monies spent in the repurchase. Defendant counterclaimed for breach of warranty in all of the contracts in which this practice was followed. Also at issue are claims by plaintiff that defendant tortiously interfered with the installment contracts between plaintiff and its buyers as well as a dispute regarding the repossession and customer redemption of a particular car, that of a Mr. Harvey.

### II. STANDARDS FOR SUMMARY JUDGEMENT

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure serves the important purpose of "conserv[ing] judicial time and energy by avoiding unnecessary trial and by providing a speedy and efficient summary disposition" of litigation in which the plaintiff fails to make some minimal showing that the defendant may be liable on the claims alleged. *Bland v. Norfolk & Southern R.R. Co.*, 406 F.2d 863, 866 (4th Cir.1969). The applicable standards for analyzing a motion for summary judgment under Rule 56 are well-established. The defendant [1] seeking summary judgment bears the initial burden of showing the absence of any genuine issue of material fact and that he is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265. In determining whether the defendant has sustained this burden, this Court must consider whether, when assessing the evidence in the light most favorable to the plaintiff, a "fair-minded jury could return a verdict for the plaintiff...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986); *Pulliam Investment Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir.1987). Nevertheless, the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512; *see also Barwick v. Celotex Corp.*, 736 F.2d 946, 958-59 (4th Cir.1984). The plaintiff must identify for the Court some dispute of fact that is material to the legal issues presented in the case in order to successfully oppose a motion for summary judgment. "The plain language of Rule 56(b) mandates entry of summary judgment, after an adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552. It is against these standards that the Court shall review defendant's motion.

---

1. The analysis is equally applicable, of course, to motions for summary judgment made by plaintiffs, as Ford Credit Company is with regard to its counterclaims.

## III. THE BREACH OF WARRANTY CLAIMS

The Maryland Vehicle Retail Installment Contracts entered into by Easton and its customers were standard form contracts. Each contract contained a section titled "Itemization of amount financed" in which the terms of the price paid were described. In relevant part, the section read:

(1) Cash Price.............................. $
(2) Down Payment
    Cash Down Payment................$
    Pickup Payment due_____, 19___.....$
    Trade-in (description above).........$
       Total Down Payment ...............$

There was no space provided to itemize any dealer rebates, that is rebates or discounts which were given by Easton to its customers. Easton included these rebates in the "cash down payment" blank.

Each of these contracts was assigned by Easton to Ford. In the assignment agreement, Easton warranted to Ford that the buyer "paid the down payment stated in the Contract with his own funds" and that "the seller [Easton] has no knowledge of any fact that would impair the validity or value of the Contract." With regard to these warranties, the assignment agreement specifically stated that

> "If there is any breach of any of the foregoing warranties, without regard to Seller's knowledge or lack of knowledge with respect thereto or Ford Credit's reliance thereon, Seller hereby agrees unconditionally to purchase the Contract from Ford Credit, upon demand, for the full amount unpaid whether the Contract shall then be, or not be, in default."

Easton claims that by requiring it to repurchase several of the installment contracts assigned, Ford breached the assignment contract. Ford responds that Easton breached the two warranties quoted above, and that the repurchases were proper pursuant to the clause which governed such breaches, and Count I of Ford's counterclaim requests that Easton repurchase all of the other contracts on which this practice was followed. The question common to both claim and counterclaim, then, is whether or not the practice of listing the dealer rebates as cash down payments

breached either of the warranties listed above.

Although there do not appear to be any cases addressing this exact question, the general rules of contract construction are well settled in Maryland law. "[T]he construction of a written contract is ordinarily considered to be an issue of law for resolution by the trial judge." *James Julian, Inc. v. State Hwy. Admin.*, 63 Md.App. 74, 94, 492 A.2d 308 (1985).

> "It is well settled that Maryland follows the objective law of contracts. [citation omitted] A court construing an agreement under this test must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. Consequently, the clear and unambiguous language of an agreement will not give way to what the parties thought that the agreement meant or intended it to mean."

*General Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 261, 492 A.2d 1306 (1985).

In the assignment contract between Easton and Ford, Easton warranted to Ford that any amounts shown as down payments had been paid by the buyer with the buyer's own funds. "Own funds" is a phrase with a plain and ordinary meaning: money which belonged to the buyer. In order to comply with the contractual warranty made to Ford, therefore, Easton must show that the down payments did consist of the buyer's own funds.

It is undisputed that Easton's practice was to list dealer rebates as cash down payments which—pursuant to the assignment contracts—were required to have been made only with the buyer's own funds. Dealer rebates, however, cannot be

said to be money belonging to the buyer but are solely reductions of the purchase price of the automobile travelling under another name. An issue similar to this one was considered by the Maryland Tax Court which held that, for the purposes of determining excise tax due, dealer rebates should be considered a diminution of the purchase price of the car and the tax due should be based upon the reduced price. This Court finds the reasoning of the Tax Court persuasive and agrees a dealer rebate is merely another form of price reduction. This Court holds that as a matter of law, this sort of rebate is not equivalent to a cash down payment paid with the buyer's own funds. Accordingly, that warranty was breached and Ford was acting within its rights under the assignment contract when it required Easton to repurchase the installment contracts. Moreover, Ford is entitled to have Easton repurchase all of the contracts in which this practice was followed and the warranty breached.

■ Easton does not argue that a dealer rebate constitutes a buyer's own funds. Instead it submits the affidavit of its chairman, Edward G. Uhl, that it was his "understanding" that Ford was aware that Easton gave rebates and encouraged the dealer to do so.

> "I believe that Ford was well aware of our rebate practices and simply was not concerned in any way that such rebates impaired or in any way lessened the value of our Contracts with our customers."

This is irrelevant to the issue at hand. According to the clause in the assignment contract, Ford is not required to have relied upon the breached warranty in order to force repurchase of the installment contracts; the existence of a breach is sufficient provocation. The contract is clear on this point.

And although Ford also alleges that the practice of including dealer rebates as if they were indeed the buyer's own funds

impaired the value of the contract, this Court's holding that the first warranty (that down payments consisted of the buyer's own funds) was breached, means that the issue of the second warranty need not be considered. Ford is entitled to its relief if *"any"* of the warranties were breached. Thus, even if Mr. Uhl's affidavit was sufficient to create a factual dispute[2], it is not material to the dispositive issue.

For the above stated reasons, defendant-counter-plaintiff Ford is entitled to judgment in its favor on Count I of the plaintiff's complaint and on Count I of its own counterclaim.

## IV. INTERFERENCE WITH CONTRACT CLAIM

■ According to the allegations contained in Easton's complaint, after Ford realized that Easton habitually listed dealer rebates as cash down payments, it forced Easton to repurchase those contracts in which the warranty was breached and upon which the buyers had defaulted.[3] In Count II of its complaint, Easton alleges that Ford then called up the customers and made false or recklessly untruthful statements "with the sole purpose of bringing about the defaults and damages resultant thereby." Easton seeks damages for what it claims is tortious interference with contract rights.

Ford, of course, denies that it made any improper statements to the car buyers. Also, Ford argues in its motion for summary judgment that whatever statements it may have made cannot lead to a tortious interference claim as Ford was a party to the contracts with which it is alleged to have interfered.

Although Maryland law does recognize the tort of intentional interference with contractual rights, "it is accepted that there is no cause of action for interference with a contract when suit is brought against a party to the contract." *Wil-*

---

2. It is doubtful that Mr. Uhl's statements regarding his "understanding" and "belief" as to Ford's knowledge or awareness would be sufficient to generate a factual issue.

3. The assignment agreement between Easton and Ford provided that Ford could require repurchase of a contract in which any warranty was breached regardless of whether or not the contract was in default.

*mington Trust Co. v. Clark*, 289 Md. 313, 329, 424 A.2d 744 (1981). *See also Brand Iron, Inc. v. Koehring Co.*, 595 F.Supp. 1037, 1039 (D.Md.1984) ("It remains the law in Maryland that only a third party who is not a party to the contract can be held liable for tortious interference with the contract.") and *Miller v. Fairchild Industries, Inc.*, 668 F.Supp. 461, 468 (D.Md. 1987) ("Maryland courts have never permitted recovery [for this tort] where both plaintiff and defendant were parties to the contract.") If Ford was a party to the installment contracts at the time when it contacted the individual buyers, then it can not be said to have interfered with the contract between the buyers and Easton.

Pursuant to the assignment agreement, the individual installment contracts were assigned to Ford; they were assigned on a non-recourse basis; and subsequent to the assignment, Ford was a party to the contracts. Ford remained a party to the contracts until each contract was repurchased by Easton pursuant to the breach of warranty clause in the assignment agreement.

In support of its motion for summary judgment, Ford produced the affidavit of its Branch Manager, Mr. Daniel McConnell, in which Mr. McConnell states that any and all contacts made by Ford to the individual buyers were made after Ford had accepted assignment of their installment contracts and before Easton had repurchased the contracts. That is, any contact was made at a time when Ford was a party to the installment contract by virtue of having accepted the assignment.

Easton submits that the affidavit is deficient in not being made upon personal knowledge. The affidavit is sufficient to support the motion. It is based on Mr. McConnell's personal knowledge both of the actual contracts and contacts in question as well as his knowledge of the regular business procedures of Ford Credit. Mr. McConnell's reliance on business records which would themselves be admissable under the hearsay exception does not render his affidavit improper. Accordingly, this Court finds that, as Mr. McConnell states, any contact made by Ford with the individual buyers was made at a time when Ford was a party to the installment contract with those buyers, and Ford cannot, under Maryland law, be liable for tortious interference with its own contract. Ford is entitled to judgment on Count II of plaintiff's complaint.

## V. THE HARVEY VEHICLE

Mr. Harvey, an individual not a party to this action, was party to an installment contract with Easton which was then assigned to Ford. Mr. Harvey was in default on this contract and his vehicle was repossessed. Ford sent him a notice explaining what amount Mr. Harvey would need to pay in order to redeem his car. Unfortunately, the notice listed too low an amount. When Mr. Harvey showed up at Easton Nissan prepared to redeem his car, Easton, acting for Ford, told Mr. Harvey that he would actually need to pay $12,-460.39 (an amount significantly greater than the originally noticed $7,899.48).

At this point, accounts differ. Easton alleges that it arranged with Ford that Mr. Harvey could pay an intermediate amount in satisfaction of the debt. Ford asserts that Easton had no authorization to accept an amount lower than the $12,460.39 and any authorization Ford may have given was conditioned on Easton's promise to pay to Ford the difference. Both parties agree that none of the money received by Easton has ever been paid to Ford.

Easton does not dispute that the amount of money received from Mr. Harvey ($8,900.00) is owed to Ford as Easton was merely acting as Ford's agent in collecting the money and releasing the car. Easton, however, says that Ford agreed to accept $8,900.00 in satisfaction of the $12,460.39. In support of this contention, Easton has submitted the affidavit of Ms. Nancy Glasgow, Office Manager of Easton Nissan. Ms. Glasgow states that she personally helped Mr. Harvey when he came to redeem his vehicle. Her testimony with regard to any agreement with Ford is that she

"*observed* Mr. Moulton [a consultant employed by Easton] contact a representa-

tive from Ford Credit, at which point it was agreed that Mr. Harvey would pay some amount, more than what he was quoted, but less than what Ford Credit said was the correct figure."

(emphasis added) Ms. Glasgow does not allege that she herself was personally involved with formulating the alleged agreement, only that she "observed" another individual call Ford's number on the telephone and speak. She does not know what was said or to whom Mr. Moulton spoke. Her testimony with regard to any agreement is thus deficient as it is hearsay not admissable into evidence. Because Easton has failed to demonstrate that there is a cognizable factual dispute, Ford is entitled to judgment on this issue as well.[4]

## VI. CONCLUSION AND ORDER

In accordance with the foregoing memorandum, it is this 4th day of January, 1991 by the United States District Court for the District of Maryland,

ORDERED:

1. That defendant-counter-plaintiff Ford's motion for summary judgment is GRANTED;

2. That judgment shall be entered in favor of defendant Ford and against plaintiff Easton on Counts I and II of plaintiff's complaint;

3. That judgment shall be entered in favor of counter-plaintiff Ford and against counter-defendant Easton on Counts I and II of counter-plaintiff's counterclaim;

4. That Count III of counter-plaintiff's counterclaim shall be dismissed as MOOT.

---

**4.** Count II and Count III of Ford's counterclaim are alternative bases for relief. (Count II requests the entire $12,460.39. Count III requests the actual amount received by Easton from Mr. Harvey.) As this Court is granting judgment on Count II of Ford's counterclaim, Count III is moot.