**Leonard VOGEL, et al., Plaintiffs,**

**v.**

**INDEPENDENCE FEDERAL SAVINGS BANK, et al., Defendants.**

**Civ. A. No. R–87–1207.**

United States District Court,
D. Maryland.

Jan. 3, 1990.

**1214**

Thomas Hoxie and Francis J. Gorman, Semmes, Bowen & Semmes, Baltimore, Md., for plaintiffs.

Michael McGowan, McCarthy, Bacon, Costello & Stephens, Landover, Md., for defendants Independent Federal Sav. Bank and Independence Financial Corp.

Bryan D. Bolton and Charles S. Fax, Shapiro & Olander, Baltimore, Md., for defendant Guardian Life Ins. Co.

William F. Ryan, Jr., Katherine L. Taylor, Whiteford, Taylor & Preston, Baltimore, Md., for defendant Arkin, Youngentob, Mitzner, DiPietro & Kopp, Inc.

## MEMORANDUM AND ORDER

RAMSEY, District Judge.

Pending before the Court in the above-captioned case are two sets of motions for summary judgment. First, each of the defendants—Independence Federal Savings Bank[1] and Independence Financial Corporation[2] ("Independence" or "the Bank"), the Guardian Life Insurance Company of America ("Guardian"), and Arkin, Youngentob, Mitzner, DiPietro & Kopp, Inc. ("the Arkin Agency" or "the Agency")[3]—have moved for summary judgment on all counts in the Third Amended Complaint. Second, the plaintiffs and Guardian have submitted cross-motions for summary judgment on Guardian's counterclaim. All motions have been fully briefed; the Court now rules without need for a hearing pursuant to Local Rule 105.6 (D.Md.1989). For the reasons set forth below, this Court will, with one exception, deny defendants' motions for summary judgment; plaintiffs' motion for summary judgment on the counterclaim will be granted and Guardian's motion will be denied.

### I. Factual Background

In the late 1960s, three friends—Leonard Vogel, Rudolph Arkin and William Fitzgerald—joined with others to establish Independence Federal Savings and Loan. Fitzgerald became the president and chief executive officer of Independence; Arkin and Vogel, along with Fitzgerald, served on the Bank's Board of Directors of which Arkin was Chairman. For many years, Vogel served as chairman of the Bank's Loan Committee, as vice president of the Bank, and as an appraiser for Independence Financial Corporation, a subsidiary of Independence Federal Savings Bank. Some-

---

1. Formerly "Independence Federal Savings and Loan".

2. Formerly "Independence Service Corporation".

3. Rudolph Arkin was originally named as a defendant in this suit but was dismissed by Order dated October 16, 1987. The Court will refer to Rudolph Arkin herein as "Arkin". His insurance agency will be referred to as the "Arkin Agency."

time in late 1974 or early 1975, Vogel asked Arkin, who also was an insurance agent,[4] whether he could enroll on the Bank's life and health insurance plan. Although there was some question whether Vogel met the literal criteria for coverage under the policy, Vogel was enrolled in the Plan.[5] Over the ensuing years, the Bank listed Vogel as an employee eligible to receive benefits and paid premiums on his behalf.

In early 1980, Independence changed its insurance carrier from New England Life to Guardian. Despite the change, Vogel continued to receive coverage under the Bank's employee benefits plan. While the policy with Guardian was, in general, a fairly standard group insurance plan, two provisions in the policy take on particular importance in this litigation. First, the policy contained no ceiling on the liability of the insurer for major medical expenses incurred by a participant. For as long as an insured incurred expenses, Guardian was obligated to pay. Second, the policy contained a provision permitting an employee,

in some circumstances, to convert the group policy to an individual policy.[6]

On June 29, 1982, Leonard Vogel suffered a stroke that left him totally disabled, unable to work, and in need of constant medical attention. A little over a month later, Independence removed him from the payroll[7] and stopped paying his Director's fees. Nevertheless, the Bank continued to pay premiums on his behalf to Guardian, and Guardian, for its part, continued to pay for the medical bills incurred by Vogel. Over the next two years, Guardian paid Vogel's medical bills while, in an effort to recoup some of these expenditures, Guardian imposed substantial increases on premiums charged to Independence. By late 1984, Independence's premiums for its insurance plan with Guardian were causing some hardship to the Bank, which was under pressure from Federal regulators to improve its financial condition. At about the same time, it became apparent that Leonard Vogel could live for many years in his incapacitated condition, never recovering and in need of continued close medical

---

4. Rudolph Arkin is a principal in Arkin, Youngentob, Mitzner, DiPietro, & Kopp, a defendant in this action. This agency was formed in 1984. Its predecessor, FAJ Associates, offered insurance advice to Independence in the 1970s.

5. At the time, Independence had contracted with New England Life for coverage of its employees.

6. The parties disagree on the precise nature of Leonard Vogel's conversion rights. Guardian relies on language in the purported master policy. Near the end of the document (whose authenticity itself is sincerely questioned by the plaintiffs) appears the following provision on a page by itself: "A covered person can't convert if his group health insurance ends because the group plan ends. And, he can't convert if health benefits are dropped from the group health plan for all employees or for his class." *See* Statement of Undisputed Material Facts and Exhibits of Co–Defendant the Guardian Life Insurance Company of America in Support of Motion for Summary Judgment at tab 12.

Plaintiffs point to the benefits booklet provided by Guardian's employee, Brenda Dix, to Leonard Vogel's son, Kenneth, in response to inquiries concerning his father's conversion rights. *See* text accompanying note 12, *infra*. The booklet contains a somewhat different explanation of an insured's conversion rights. It reads:

The Group Policy provides that if major medical expense insurance under the Group Policy terminates for any reason other than your failure to make any required contributions and provided (1) the terminated insurance is not replaced by similar group insurance or coverage within thirty-one days and (2) you have been continuously insured under the Group Policy ... for at least three months immediately prior to termination, you shall, subject to the conditions hereinafter stated, be entitled to have issued to you, without evidence of insurability, a policy of insurance (hereinafter referred to as the "Converted Policy") by making written application therefor and paying the first quarterly premium, or at your option a semi-annual or annual premium, to the Guardian within thirty-one days after such termination of insurance.

. . . . .

The individual policy available upon conversion shall be of the type and form being issued The Guardian as a converted policy at the time of application and shall be renewable and designed to afford lifetime coverage....
*See* Exhibits to Plaintiffs' Opposition to Defendants' Motions for Summary Judgment at tab 1.

7. Prior to his stroke, Leonard Vogel had been earning approximately $3,500 per year performing a variety of functions for the Bank, including working as an appraiser for real estate loans and appearing on behalf of the Bank at public events.

attention.[8] Thereafter, the Arkin insurance agency, at the Bank's behest, began looking into a means to stem the ever increasing premiums being paid to Guardian.[9] Eugene Youngentob, who at the time was both a member of the Arkin Agency and an employee of Guardian,[10] and his partner Joseph DiPietro, sought quotations from several insurance companies to replace the Guardian policy. In June 1985, while this review was underway, Vogel was removed from the Board of Directors of Independence, yet the Bank continued to pay premiums on his behalf to Guardian. At a meeting held September 18, 1985, the Board, relying on the recommendation of Board Chairman Rudolph Arkin and his insurance agency, decided to change insurance carriers effective November 1, 1985. The new policy, issued by Union Mutual, covered all previously covered employees of Independence with the exception of Leonard Vogel. Since Vogel was "totally disabled" at the time the Guardian policy was terminated, he was entitled under that policy to receive an additional year of coverage.[11] Thus, he was covered until November 1, 1986.

A few weeks after the Independence Board of Directors decided to adopt a new insurance plan that excluded coverage for Vogel, Rudolph Arkin called Mrs. Irene Vogel to inform her that her husband's coverage would cease. The Vogel family had not been informed prior to this phone call that Independence had been considering changing insurance carriers and, in the process of such a change, dropping coverage for Leonard Vogel. In the hope of extending coverage for their father, the Vogel family then sought to determine whether any right to convert the group policy to an individual policy existed. Twice in January 1986, Leonard Vogel's son Kenneth wrote to Aradyne Ardister, the Independence employee who served as the liaison with Guardian, seeking a copy of the insurance plan or the booklet provided to Independence employees that outlined plan benefits. Independence never provided a copy of the policy, although Brenda Dix of Guardian did eventually forward a copy of a benefits booklet to Kenneth Vogel.[12] Attempts to exercise a right of conversion on Leonard Vogel's behalf were rejected by Guardian.

On November 1, 1986, when the Guardian policy's coverage expired, Leonard Vogel was left without any insurance. Because of his condition, he was not able to obtain any other insurance. As a result, Vogel could no longer afford the continuous medical attention he had been receiving and, although his family spent considerable sums to provide for his care, the quality of Vogel's medical care declined. On May 1, 1987, again at the suggestion of the Arkin

8. *See* Exhibit 28 to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (letter from Dr. Albert Grollman to Ms. Bernadine McGraw, Guardian's Personal Claims Manager, dated September 18, 1984).

9. There is some evidence in the record, as well as extensive argumentation, that the motivation for considering a change in policies stemmed from employee dissatisfaction with the Guardian policy. While employee dissatisfaction may have been a factor, the defendants do not seriously dispute that the rising premiums on the Guardian policy were a motivating factor as well.

10. Youngentob became a "Career Development Manager" for Guardian in July 1983. As such, he was an employee of Guardian and on the track to becoming a General Agent. At the end of the three-year probationary period, Youngentob was made a General Agent.

11. Vogel was entitled to this coverage under the "extension of benefits" clause of the Guardian policy. This provision reads:

An extension of benefits will be provided to a former Covered Person who is totally disabled and under a Physician's care on the date his insurance ends. No further premiums must be paid for this extension.... The extension will end on the first of the following: (a) the date such Person stops being totally disabled; or (b) the end of a one year period which starts on the date such Person's insurance ends....

12. The booklet that Kenneth Vogel received contained the description of a conversion rights that apparently entitled Leonard Vogel to obtain to an individual policy. *See supra* note 6. The policy ultimately provided by Guardian, which was not assembled until this litigation commenced, contained the more restrictive conversion right. With regard to this policy, there exists some serious doubt of authenticity.

Agency, Independence dropped its insurance policy with Union Mutual and re-enrolled with Guardian. This new Guardian policy, like the Union Mutual policy it replaced, did not provide coverage for Leonard Vogel. On May 12, 1987, Leonard Vogel died.

Plaintiffs filed a complaint in the Circuit Court for Montgomery County. Defendants removed the action to this Court on May 13, 1987, claiming that the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, preempted all of plaintiffs' state law claims and gave jurisdiction to the Federal District Court for the District of Maryland. *See Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987) (removal proper, even if face of complaint states no basis for federal jurisdiction, because of broad preemptive design of ERISA). As it now stands, plaintiffs'[13] Third Amended Complaint sets out ten counts, as follows:

*Count I:* Breach of duty under the plan by Independence for cancelling the Guardian policy and purchasing new coverage for every employee with the exception of Leonard Vogel;

*Count II:* Breach of duty under the plan by Guardian for failure to permit Leonard Vogel to convert his group insurance to an individual policy;

*Count III:* Interference with payment of plan benefits in violation of ERISA § 510, 29 U.S.C. § 1140, by all defendants for discriminatorily terminating Leonard Vogel's coverage;

*Count IV:* Failure to supply plan information upon request by Independence in violation of ERISA §§ 104(b)(4) & 502(c), 29 U.S.C. §§ 1024(b)(4) & 1132(c);

*Count V:* Breach of fiduciary duty by Independence in violation of ERISA § 409, 29 U.S.C. § 1109, for causing Leonard Vogel to lose his insurance coverage without prior notification to his family, and for placing its own self-interest above that of Leonard Vogel;

*Count VI:* Breach of fiduciary duty by Guardian in violation of ERISA § 404 for terminating Leonard Vogel's coverage and denying him the opportunity to convert to an individual policy;

*Count VII:* Breach of fiduciary duty by the Arkin Agency in violation of ERISA § 404 for recommending the termination of the Guardian policy in order to reduce the premiums paid by Independence and the expenditures of Guardian;

*Count VIII:* State law estoppel against all defendants in that the plaintiffs reasonably relied to their detriment on the defendant's promises that Leonard Vogel's coverage under the Guardian policy would not be cancelled;

*Count IX:* State law conspiracy to violate ERISA and state laws regulating insurance by all defendants in agreeing to terminate Leonard Vogel's health coverage;

*Count X:* State law indemnification against Independence and the Arkin Agency if Guardian prevails on its counterclaim against plaintiff's for recovery of monies paid on Leonard Vogel's behalf during the time of Guardian's coverage.[14]

Guardian's three-count counterclaim, filed after this Court denied Guardian's motion to dismiss,[15] seeks to recover from Leonard Vogel's estate and the Vogel family slightly over $720,000.00 paid by Guardian under Leonard Vogel's life and health insurance policies. In the counterclaim, Guardian alleges, in essence, that Leonard Vogel was never entitled to receive cover-

---

**13.** Named plaintiffs for each of the ten counts are the Estate of Leonard Vogel, represented by Kenneth Vogel, Leonard Vogel's widow, Irene Vogel, and Leonard Vogel's adult children, Kenneth, Jason, and Dianna Vogel.

**14.** Each count is brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), with the exception of Count IV, which is also brought under ERISA § 502(c), 29 U.S.C. § 1132(c), and Count

X, which is not brought under any specified provision of ERISA.

**15.** *See* Memorandum and Order dated August 5, 1988, reported at 692 F.Supp. 587 (D.Md.1988). This dismissal was confirmed in Memorandum and Orders dated October 3, 1988, and October 31, 1988.

age under the Guardian policies.[16]

## II. Standards for Summary Judgment

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure serves the important purpose of "conserv[ing] judicial time and energy by avoiding unnecessary trial and by providing a speedy and efficient summary disposition" of litigation in which the plaintiff fails to make some minimal showing that the defendant may be liable on the claims alleged. *Bland v. Norfolk & Southern R.R. Co.,* 406 F.2d 863, 866 (4th Cir.1969). The applicable standards for analyzing a motion for summary judgment under Rule 56 are well-established. The defendant[17] seeking summary judgment bears the burden of showing the absence of any genuine issue of material fact and that he is entitled to judgment as a matter of law. In determining whether the defendant has sustained this burden, this Court must consider whether, when assessing the evidence in the light most favorable to the plaintiff, a "fairminded jury could return a verdict for the plaintiff...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986); *Pulliam Investment Co. v. Cameo Properties,* 810 F.2d 1282, 1286 (4th Cir.1987). That is, the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to defeat a motion for summary judgment. *Id.; see also Barwick v. Celotex Corp.,* 736 F.2d 946, 958–59 (4th Cir.1984). Yet, if the plaintiff is able to bring forward evidence sufficient to create a legitimate dispute of material fact, or if the plaintiff is able to successfully oppose a legal contention made by defendant that would lead to summary judgment, then this Court must deny defendant's motion.

## III. Defendants' Motions for Summary Judgment on the Third Amended Complaint

The lengthy memoranda submitted by defendants in support of their motions set forth numerous grounds upon which, defendants contend, summary judgment should be granted. Indeed, each of the counts in the complaint is challenged in some respect. Before turning attention to the arguments as they pertain to each count, this Court will consider three threshold challenges to the plaintiffs' case: all defendants' contention that Leonard Vogel's family lacks standing to sue under ERISA; Guardian's contention that this Court lacks subject matter jurisdiction over Counts II, III, VI, and IX of the Third Amended Complaint because of a failure to exhaust administrative remedies; and the Arkin Agency's contention that it should be dismissed from the suit altogether.[18]

### A. Threshold Challenges

#### 1. The Vogel Family's Standing.

Each defendant argues that Leonard Vogel's wife, Irene Vogel, and his adult children, Kenneth, Jason, and Dianna Vogel, lack standing to bring any claims un-

---

**16.** This counterclaim states three alternative theories of recovery, depending on this Court's determinations of related issues in this litigation. As described in Guardian's Memorandum in Support of its Cross–Motion for Summary Judgment, its counterclaim alleges:

> [T]hat if the Court finds: (i) that Leonard Vogel was never an employee of [Independence] ... at any time from January 1, 1981 through November 1, 1986, then he was not entitled to receive benefits from Guardian and Guardian is entitled to the return of all monies paid; (ii) that the provisions of the Guardian policy are void and unenforceable as a matter of law, then the Court should rescind the policy and return the parties to the *status quo ante;* and/or (iii) that if the policy is judicially modified and the conversion benefit provided by Maryland law is held

to be applicable, then Guardian overpaid benefits in the amount of $67,000.00
*Id.* at 1–2.

**17.** The analysis is equally applicable, of course, to a motion for summary judgment made by a plaintiff.

**18.** This Court will not address the argument made by each defendant that extracontractual damages are not available under ERISA and, accordingly, summary judgment should be entered on that issue. This argument has been carefully considered and reconsidered by this Court in response to previous motions in this litigation and the Court abides by and hereby reaffirms those decisions. *See Vogel,* 692 F.Supp. at 594–96; Memorandum and Order dated October 3, 1988.

der ERISA. Section 502 of ERISA, 29 U.S.C. § 1132, the statute's civil enforcement provision, defines those instances in which suit may be brought to enforce the various duties imposed by ERISA and who may bring such suits. It reads, in pertinent part:

**(a) Persons empowered to bring a civil action**

A civil action may be brought—

 (1) by a participant or beneficiary—

 (A) for the relief provided for in subsection (c) of this section [i.e., administrator's refusal to supply requested information], or

 (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

 (2) ... by a participant, beneficiary, or fiduciary for appropriate relief under section 1109 of this title [breach of fiduciary duty];

 (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of the subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

Regardless of the theory of the suit, this provision, along with ERISA § 502(e)(1), quite clearly limits ERISA standing to participants, beneficiaries, and fiduciaries.[19]

Defendants, pointing to ERISA's definitional section, ERISA § 3, 29 U.S.C. § 1002, contend that the Vogel family falls within none of these categories. The plaintiffs here admit that the wife and children of Leonard Vogel are neither fiduciaries under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), nor participants under ERISA § 3(7), 29 U.S.C. § 1002(7). *See*

*Firestone Tire & Rubber Co. v. Bruch,* —— U.S. ——, 109 S.Ct. 948, 957–58, 103 L.Ed.2d 80 (1989) ("the term 'participant' is naturally read to mean either 'employees in, or reasonably expected to be in, currently covered employment ...'") (*quoting Saladino v. I.L.G.W.U. Nat'l Retirement Fund,* 754 F.2d 473, 476 (2d Cir.1985)). They do contend, however, that they are embraced by the definition of beneficiary in ERISA § 3(8), 29 U.S.C. § 1002(8). This section reads: "The term 'beneficiary' means a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." Defendants strongly contest this assertion.

Of course, the starting point for statutory interpretation is the plain language of the statute. *See, e.g., Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980). Nevertheless, the particular provision being construed must be read in context: The entire statute and the goal it seeks to fulfill must also guide the interpretation. *See Little People's School, Inc. v. United States,* 842 F.2d 570, 573 (1st Cir.1988); *American Mining Congress v. Environmental Protection Agency,* 824 F.2d 1177 (D.C.Cir.1987) ("the statutory provision cannot properly be torn from the law of which it is a part; Context and structure are ... of substantial import in the interpretive exercise"). Although neither Irene Vogel nor any of the Vogel children were designated beneficiaries under Leonard Vogel's health insurance plan, the allegations in this case make clear that the benefits guaranteed by Leonard Vogel's plan inured to their benefit as well as to Leonard Vogel's. Accordingly, as explained below, taking into account the entire statutory scheme and the goal ERISA seeks to fulfill, this Court finds that interpreting the definition of "beneficiary" in

---

**19.** To the same effect, the jurisdictional section of ERISA, § 502(e)(1), 29 U.S.C § 1132(e)(1), provides:

 Except for actions under subsection (a)(1)(B) of this section, the district courts of the United States shall have exclusive jurisdiction of the civil actions under this subchapter brought by the Secretary or by a participant, beneficiary, or fiduciary. State courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction of actions under subsection (a)(1)(B) of this section.

ERISA § 3(8) to include the Vogel family is warranted.

In two cases decided the same day, *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 152–54, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970) ("*ADAPSO*"), and *Barlow v. Collins*, 397 U.S. 159, 163, 90 S.Ct. 832, 835, 25 L.Ed.2d 192 (1970), the Supreme Court established the now-familiar analysis for determining an individual's standing to sue under a federal statute. As articulated by the court in *Fentron Industries, Inc. v. National Shopmen Pension Fund*, 674 F.2d 1300, 1304 (9th Cir.1982), "[i]n order to have standing to sue for violations of a federal statute, a plaintiff must: (1) suffer an injury in fact; (2) fall arguably within the zone of interests protected by the statute allegedly violated; and (3) show that the statute itself does not preclude the suit." *See Collins v. Seafarers Pension Trust*, 641 F.Supp. 293, 296 (D.Md.1986) (adopting *ADAPSO* analysis to standing under ERISA), *rev'd*, 846 F.2d 936 (4th Cir.1988). Applying this three-part analysis to the case at hand demonstrates that the individual plaintiffs have standing to maintain this action.

First, Leonard Vogel's family has certainly suffered an "injury in fact." No party disputes the fact that the Vogel family incurred substantial financial obligations when Leonard Vogel's health insurance was terminated in November 1986. As the family notes, under Maryland law they were obligated to provide support to a physically infirm spouse, Md.Fam.Law Code Ann. § 10–201, and parent, Md. Fam.Law Code Ann. § 13–102. In fulfillment of this legal duty, the family used funds held in a common account to pay for Leonard Vogel's care. Whether the defendants (or some subset thereof) are ultimately found to be legally liable under ERISA for Leonard Vogel's care, the plaintiffs undoubtedly have suffered an "injury in fact."

Second, this Court finds that "the interest sought to be protected" by Leonard Vogel's family (i.e., that his health insurance benefits not be terminated in violation of ERISA, thereby forcing them to incur financial liabilities and suffer emotional distress) is "arguably within the zone of interest sought to be protected" by ERISA. *ADAPSO*, 397 U.S. at 153, 90 S.Ct. at 830. The Court in *ADAPSO*, in reviewing some of its own cases, noted that the "zone of interest" test has broad contours. Plaintiffs alleging "aesthetic" and "spiritual" interests have, in appropriate circumstances, been found to fall within the zone of interest protected by a particular statute. *See ADAPSO*, 397 U.S. at 154, 90 S.Ct. at 830 (and cases cited therein). Here, Leonard Vogel's family alleges a financial and emotional interest that is protected by the ERISA statute. In opposition, defendants properly note that plaintiffs' financial and emotional interests are consequential, not direct. This Court is not persuaded, however, that standing to sue under ERISA is therefore precluded. The purposes of the ERISA statute are best fulfilled by recognizing family members' standing to sue when those family members necessarily incur financial obligations and suffer significant emotional distress as the result of an allegedly illegal termination of ERISA-regulated insurance benefits.

The legislative purpose animating ERISA is recited in the opening sections of the law. Section 2 of ERISA, 29 U.S.C. § 1001, entitled "Congressional findings and declaration of policy," announced Congress' desire to enact comprehensive legislation to ensure "the continued well-being and security of millions of employees and their dependents [who] are directly affected by these plans." That is, it is both "employees their beneficiaries" that Congress sought to protect by enacting ERISA. *See* ERISA §§ 2(a) and 2(c), 29 U.S.C. §§ 1001(a) and 1001(c). As Judge Weinfeld held in *Cartledge v. Miller*, 457 F.Supp. 1146, 1156 (S.D.N.Y.1978), the Congress "was concerned that 'employees and their beneficiaries'—*the entire family*—be protected by ERISA." (emphasis added). This Court concurs with Judge Weinfeld's vision of the scope of ERISA's protection and with his concomitant broad conception of who is a beneficiary entitled to sue under ERISA. *See id.* at 1156 n. 53 (defining

beneficiary "in its broad sense when it is used in the preamble, which was a general statement of the goal of the statute, not a technical recitation"). Moreover, "ERISA, like the Civil Rights Act of 1871 and 1964, and the Labor–Management Reporting and Disclosure Act, is remedial legislation which should be liberally construed...." *Smith v. CMTA–IAM Pension Trust,* 746 F.2d 587, 589 (9th Cir.1984). Construing the "zone of interests" protected by ERISA to embrace the claims brought by the Vogel family would fulfill the remedial purpose of ERISA by giving ERISA's enforcement provisions real force.

Section 502(a) of ERISA, the civil enforcement provision, quite clearly does not preclude the Vogel family from suing. Defendants argue that the Vogel family is not suing to recover money "due to [them] under the terms of [their] plan" as is required by § 502(a)(1)(B). Accordingly, defendants contend that the family cannot maintain this action. Plaintiffs, however, do not rely specifically on § 502(a)(1)(B). Rather, each count of their complaint refers generally to § 502(a).[20] Subsection 3 of § 502(a) does not contain a similar "due them" restriction. Rather, it is cast in broad, equitable terms that clearly do not preclude this suit. *Cf. Firestone Tire,* 109 S.Ct. 948.

Moreover, ERISA's jurisdictional provisions contained in § 502(e) do not preclude the Vogel family's standing. A consensus is emerging in the Circuit Courts of Appeal that employers that are not otherwise fiduciaries lack standing to bring an action under ERISA. For example, the court in *Giardono v. Jones,* 867 F.2d 409 (7th Cir. 1989), applied the "zone of interest" test established in *ADAPSO* to the question of employer standing. It concluded that to permit a "non-enumerated party," such as an employer, to maintain an ERISA action would constitute an impermissible exten-

sion of a federal court's subject matter jurisdiction. *Id.,* 867 F.2d at 412 (and cases collected therein).[21] This reasoning, however, does not preclude the Vogel family from bringing this action. Rather than asserting that a new "non-enumerated" class of plaintiffs be permitted to sue under ERISA, the plaintiffs ask simply that the definition of an enumerated—beneficiaries—be read to include the family of a plan participant. As discussed above, ERISA permits such a reading.

Finally, this Court emphasizes that its determination that the Vogel family has standing to pursue their claims is reinforced by the special duty imposed on district courts by ERISA to develop a "federal common law of rights and obligations under ERISA-regulated plans...." *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 56, 107 S.Ct. 1549, 1558, 95 L.Ed.2d 39 (1987). As Justice Brennan noted in his concurrence in *Massachusetts Mutual Life Ins. Co. v. Russell,* 473 U.S. 134, 148, 105 S.Ct. 3085, 3093, 87 L.Ed.2d 96 (1985):

The legislative history [of ERISA] demonstrates that Congress intended federal courts to develop federal common law in fashioning the additional "appropriate equitable relief." In presenting the Conference Report to the full Senate, for example, Senator Javits, ranking minority member of the Senate Committee on Labor and Public Welfare and one of the two principal Senate sponsors of ERISA, stated that "[i]t is also intended that a body of Federal substantive law will be developed by the courts to deal with issues involving rights and obligations under private welfare and pension plans." Senator Williams, the Committee's Chairman and the Act's other principal Senate sponsor, similarly emphasized that suits involving beneficiaries' rights "will be regarded as arising under the laws of the United States, in similar fashion to those

**20.** The one relevant exception to count IV, which asserts a claim against Independence under ERISA § 502(c) for failure to supply plan information. Of necessity, this claim is brought only pursuant to § 502(a)(1)(A). Inasmuch as no penalty other than the statutory $100 per day fine is sought by plaintiffs, there is no need to

consider whether the Vogel family has standing to bring a § 502(c) action; the estate of Leonard Vogel certainly has such standing.

**21.** The only "enumerated" classes in ERISA § 502 are beneficiaries, participants, and fiduciaries.

brought under section 301 of the Labor Management Relations Act." Section 301, of course, "authorizes federal courts to fashion a body of federal law" in the context of collective-bargaining agreements, to be derived by "looking at the policy of the legislation and fashioning a remedy that will effectuate that policy." *Id.* at 156–57, 105 S.Ct. at 3097–8. (citations and footnotes omitted).

The legislative history, preamble, and reticulated structure of ERISA all point to the conclusion that ERISA was designed to offer real protection for American workers who participate in, and rely upon, employee benefit plans. ERISA must be read to give effect to that overarching policy. Permitting the Vogel family—who quite evidently would have benefitted had Leonard Vogel's insurance not been terminated—to bring suit to recover for injuries allegedly done them gives effect to ERISA's policy.

### 2. *Exhaustion of Administrative Remedies.*

Second, Guardian asserts that this Court lacks subject matter jurisdiction over Counts II, III, VI, and IX of the Complaint because of the plaintiffs' alleged failure to exhaust their administrative remedies. Characterizing these claims as arising under non-preempted state law regulating insurance, Guardian contends that plaintiffs' failure to pursue available *state* administrative proceedings deprives this Court of jurisdiction.

■ As an initial matter, two of the four counts challenged by Guardian come directly from the body of ERISA itself, not from any state law regulating insurance. Count III alleges that Guardian (and the two other defendants) interfered with Leonard Vogel's attainment of plan benefits in a discriminatory manner, thereby violating ERISA § 510; Count VI alleges that Guardian breached its fiduciary duty owed to plaintiffs in violation of ERISA § 404. If any exhaustion requirement attached to

these two counts, it would be derived from ERISA itself, not from state insurance law.

■ Moreover, if any exhaustion requirement attached to the non-preempted state law counts (Counts II and IX), that requirement would also be derived from ERISA, not from state insurance law. Put simply, regardless of the theory of the particular cause of action, (that is, whether derived from the body of ERISA or from non-preempted state law), the procedural prerequisites to maintaining an ERISA action in federal court are derived from federal law, not from state law. To understand this point, it is necessary to briefly review ERISA's preemption provisions. Section 514(a) of ERISA, 29 U.S.C. § 1144(a), provides that the substantive provisions of ERISA preempt any state laws that "relate to any employee benefit plan." Section 514(b)(2)(A) of ERISA, 29 U.S.C. § 1144(b)(2)(A), exempts from ERISA's preemptive effect the "law of any state which regulates insurance...." *See generally Pilot Life*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39. Thus, two classes of state law are not preempted by ERISA: (1) state law that does not pertain to employee benefit plans at all; and (2) state law that does pertain to such plans but, in addition, regulates insurance.

■ Plaintiffs' conspiracy count, quite clearly, is not preempted by ERISA because it falls within the first category. Inasmuch as common law conspiracy has no inherent tie to any state law regulating insurance, Guardian's contention that state remedies administered by the Insurance Commissioner's office should apply to plaintiffs' conspiracy allegation is without merit. Charges of common law conspiracy are not adjudicated by the Insurance Commissioner. Therefore, as with Counts III and VI, if any exhaustion requirement exists, it would come from ERISA itself, not from state law administrative procedures.

■ With regard to Count II, this count is essentially a breach of insurance contract claim.[22] This claim is not preempted

---

22. *See Vogel,* 692 F.Supp. at 591. It should also be noted that the reasoning regarding Count II is equally applicable to Count I. No exhaustion

requirement attaches to either breach of insurance contract claim.

by ERISA because it falls in the second class of non-preempted claims: state law that regulates insurance. Guardian's contention that this pendent state law claim is cognizable only after plaintiffs exhaust available state insurance law remedies, however, is not persuasive. In discussing the civil enforcement provision of ERISA in *Pilot Life*, the Supreme Court held that:

> [T]he detailed provisions of § 502(a) set forth a comprehensive civil enforcement scheme that represents a careful balancing of the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans.... The deliberate care with which ERISA's civil enforcement remedies were drafted and the balancing of policies embodied in its choice of remedies argue strongly for the conclusion that ERISA's civil enforcement remedies were intended to be exclusive. This conclusion is fully confirmed by the legislative history of the civil enforcement provision.

*Id.*, 481 U.S. at 54, 107 S.Ct. at 1556. The exclusivity of ERISA's civil enforcement scheme leads this Court to conclude that all claims brought under ERISA—whether derived directly from ERISA's substantive provisions or derived from non-preempted state law claims—are subject to the procedures developed for adjudicating ERISA claims generally. To require that plaintiffs bringing pendent state insurance law claims shepherd those claims through state administrative proceedings while other claims in the same complaint need not go that route would undermine the "carefully integrated civil enforcement" scheme of ERISA. *Massachusetts Mutual*, 473 U.S. at 146, 105 S.Ct. at 3092. Accordingly, Guardian's contention that this Court lacks subject matter jurisdiction over any of plaintiffs' counts for failure to exhaust state law administrative remedies is without merit.

■ This determination, however, does not dispose of the exhaustion argument. As the Fourth Circuit recently held in *Ma-*

*kar v. Health Care Corporation of the Mid–Atlantic*, 872 F.2d 80, 82 (4th Cir. 1989), exhaustion of plan remedies in an ERISA action "generally is required." *See also Kross v. Western Electric Co.*, 701 F.2d 1238, 1243–45 (7th Cir.1983). This requirement is derived from the general import of the statute rather than from any specific provision. *Id.* It is, moreover, a prudential matter the application of which committed to the sound discretion of the trial court. *See Amato v. Bernard*, 618 F.2d 559, 568 (9th Cir.1980). In the exercise of this discretion, two exceptions to the exhaustion requirement have been recognized. First, if it appears that it would be futile for a plaintiff to have pressed his claim through the plan's established remedies, then a failure to exhaust may be excused. *Dameron v. Sinai Hospital of Baltimore*, 626 F.Supp. 1012, 1015 (D.Md. 1986), *aff'd in relevant part*, 815 F.2d 975 (4th Cir.1987). Second, if it appears that the plaintiffs would have been denied "meaningful access" to established internal procedures, then, again, a failure to exhaust may be excused. *See, Watson v. Fuller Brush Co.*, 570 F.Supp. 1299 (W.D. Mich.1983); *Makar*, 872 F.2d at 83.

Guardian does not contend that plaintiffs failed to exhaust plan remedies, nor could it. First, it appears that plaintiffs did attempt to pursue plan remedies. Kenneth Vogel, on his father's behalf, sought information regarding his father's right to convert to an individual policy. After initially being rebuffed, he eventually received a plan booklet that described conversion rights. When Kenneth attempted to exercise these rights for his father, Guardian refused to allow him a conversion. Thus, it appears from the record that plaintiffs have exhausted their remedies under the plan at issue.

■ In any event, if any additional procedures existed that were not pursued by the Vogels, their failure to exhaust these remedies would be excused under the exception for futility. Given the alleged conduct of all defendants in this case,[23] there

---

23. When considering a motion for summary judgment, the Court must view the facts in the

light most favorable to the non-moving party,

was no reason for the Vogels to have believed that any defendant would change its position. Hence, attempted exhaustion would be futile. *See Dameron*, 626 F.Supp. at 1015 ("where '[t]he Board [of Trustees] has already determined [the] question ... [and] there is no reason to believe that it will change its position,' exhaustion would be futile.") (*quoting Morgan v. Laborers Pension Trust Fund*, 433 F.Supp. 518, 529 (N.D.Cal.1977)); *see also Lee v. Prudential Ins. Co. of America*, 673 F.Supp. 998, 1002–03 (N.D.Cal.1987).

### 3. The Propriety of the Arkin Agency as a Defendant.

■ The Arkin Agency contends that it is not a proper party to this action for two reasons: first, it was not in existence in 1975 when Independence allegedly agreed to provide health insurance to Leonard Vogel under its employee benefits plan and, accordingly, was not a party to any such agreement; and second, all actions taken by Rudolph Arkin in connection with the termination of Leonard Vogel's insurance benefits were taken in his capacity as Chairman of the Board of Independence, not as a principal in the Arkin Insurance Agency. Neither of these arguments bear scrutiny.

The relevant focus of this litigation is not simply the 1975 agreement between Leonard Vogel and Independence to place Vogel on the Bank's health plan. The decision in 1985 to terminate the Guardian plan in favor of a plan with Union Mutual is, of course, also central to the plaintiffs' allegations in Counts III, VII, VIII, and IX. The plaintiffs have quite clearly alleged sufficient facts to support a jury's determination that the Arkin Agency was involved in the decision to switch carriers and then, a year-and-a-half later, to switch back.

Moreover, there is very little to be said for the Agency's position that all of Rudolph Arkin's actions taken in connection

with the termination of Leonard Vogel's insurance occurred while he was wearing his hat as Chairman of the Board of Independence. Plaintiffs have alleged, quite plausibly, that Rudolph Arkin's recommendations *as an insurance agent* weighed heavily in the Board's decision to switch carriers and to terminate coverage for Leonard Vogel. Accordingly, summary judgment in favor of the Arkin Agency will be denied.

### B. Challenges to Specific Counts

#### 1. Counts I and II.

The first two counts of plaintiffs' complaint are, as noted above, essentially state law breach of insurance contract claims that are not preempted by ERISA. Plaintiffs allege that the termination of Leonard Vogel's health insurance under the group plan by Independence (Count I), and the refusal of Guardian to permit him to convert to an individual plan (Count II), constituted a breach of defendants' respective obligations under the policy.

■ Independence argues that it did not breach its duties to Leonard Vogel because it never contracted to provide Leonard Vogel with health insurance benefits for life—or, indeed, at all. Plaintiffs respond that their claim is not that Leonard Vogel had some entitlement to lifetime coverage, but rather that he had a contractual right not to have his coverage unfairly terminated. Clearly issues of material fact regarding this count abound. Summary judgment must, therefore, be denied as to Count I.

■ As to Count II, Guardian asserts that neither the policy nor the governing state law [24] provides Leonard Vogel with any right to convert his group coverage to an individual policy. It points to the provision contained in the policy it provided to plaintiffs in the course of this litigation

---

i.e., the estate of Leonard Vogel and the Vogel family.

**24.** Guardian argues extensively that the law of the District of Columbia applies to the construction and enforcement of the insurance policy. It claims that neither the law of Maryland—

Leonard Vogel's domicile—nor the law of Rhode Island—the state designated on page one of the policy as having its law govern enforcement of the policy—is applicable. For present purposes, this dispute need not be resolved.

that denies a right to convert if the entire policy is terminated. *See* note 6, *supra*. Plaintiffs' response is twofold: first, they challenge the authenticity of the policy produced by Guardian, especially the lonely clause near the end of the document that Guardian relies upon; second, plaintiffs' point to language in the benefits booklet provided by Guardian to Kenneth Vogel that contradicts the language relied upon by Guardian.

Quite clearly, disputes of material fact exist regarding Leonard Vogel's conversion rights under the policy. Summary judgment cannot be granted as to Count II.

### 2. Count III.

Section 510 of ERISA, 29 U.S.C. § 1140, provides that "[i]t shall be unlawful for any person to discriminate against a participant or beneficiary ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan...." Relying on this section, plaintiffs have alleged that each of the defendants unlawfully interfered with Leonard Vogel's right to receive coverage and convert to an individual policy. Defendants set out a number of objections to this count; none, however, merits a grant of summary judgment in its favor.

Independence asserts that it did not, as a matter of law, violate § 510. Mere termination of benefits, Independence argues, does not constitute unlawful interference and, in any event, when Vogel's insurance was terminated he was no longer an Independence employee. Plaintiffs respond that their complaint is not based simply on the termination of insurance, but upon the fact—apparently not disputed by any of the defendants—that Leonard Vogel was singled out for termination. Moreover, plaintiffs have brought forward a number of facts that call into dispute Independence's assertion that Leonard Vogel was not an employee of the bank at the time his insurance was terminated. After his stroke, for instance, Leonard Vogel's name still appeared on Independence Federal Savings and Loan letter head as Vice President.

*See* Tab 7 to Plaintiff's Opposition to Defendants' Motion for Summary Judgment (letter dated January 26, 1984). In addition, an insurance invoice from Guardian to Independence dated October 1, 1985 lists "L. Vogel" as an employee for whom Independence was making premium payments. *See id.* at Tab 6. Certainly, these exhibits suffice to put Leonard Vogel's employment status at issue.

With regard to the other two defendants, both the Arkin Agency and Guardian contend that there exists no evidence that they were involved in the decision to terminate Leonard Vogel's coverage; they assert that they simply acted at the direction of Independence to terminate coverage for all of Independence's employees when Independence decided in October 1985 to change insurers. Plaintiffs note, in response, that Eugene Youngentob, a Guardian employee and a principal in the Arkin Agency, was deeply involved in the search for a new policy for Independence, and that he knew that this new policy would cover all bank employees except Leonard Vogel. Thus, plaintiffs assert that both entities should be charged with knowledge that the purpose of the termination and subsequent reinstatement of the Guardian policy was to interfere in a discriminatory manner with Leonard Vogel's attainment of plan benefits.

The requirements for establishing a prima facie case under § 510 of ERISA have been variously stated. In *Gavalik v. Continental Can Co.*, 812 F.2d 834, 858 (3d Cir.), *cert. denied*, 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987), the court held that to make out a *prima facie* case under § 510, the plaintiff must show "(1) prohibited employer conduct (2) taken *for the purpose of* interfering (3) with the attainment of any right to which the [plaintiff] may become entitled" (emphasis added). That is, the "specific intent" to violate ERISA must be shown. *Id.* at 857. In *Furcini v. Equibank, NA*, 660 F.Supp. 1436, 1442 (W.D.Pa.1987), the court explicitly differed with the *Gavalik* court, holding that a *prima facie* case under § 510 consists of a showing "(i) that [plaintiff]

was a candidate for a benefit protected by ERISA (ii) that [plaintiff] was denied that benefit; and (iii) that he satisfied the conditions for receiving that benefit." No evidence of specific intent is required. *Id.*

In the absence of any direction from the Fourth Circuit on the question, this Court adopts, without deciding, the more rigorous standard expressed in *Gavalik.* Applying this standard, it is clear that plaintiffs have alleged sufficient facts that, if proven at trial, would establish a *prima facie* case under § 510. The lack of "smoking gun" evidence does not undermine this conclusion. The specific intent to violate ERISA § 510 may, of course, "be satisfied by the introduction of circumstantial evidence" that points to the conclusion that the defendant possessed the requisite scienter. *See, e.g., Gavalik,* 812 F.2d at 852. Thus, plaintiffs' contentions that all three defendants worked in concert to deprive Leonard Vogel of his rights under the plan, although disputed by defendants, are supported by competent evidence; hence, a dispute of material fact exists on this score that precludes summary judgment.

 Defendants Guardian and the Arkin Agency also argue that they are entitled to summary judgment on count III because they were not Leonard Vogel's employers. Relying on a recent Fourth Circuit opinion, they assert that Section 510 "relief is only available to an employee against his employer." *Rogers v. Jefferson–Pilot Insurance Co.,* 883 F.2d 324, 326 (4th Cir.1989). While defendants correctly quote the Court of Appeals decision, they fail to note that the *Rogers* court was not addressing *whether* an insurance agent or insurer may be sued under § 510. The language from *Rogers* is simply *dicta* that plainly contradicts § 510, which permits suit against "any person." As this Court previously held, "any person" includes an insurance agent and an insurance company. *See Vogel,* 692 F.Supp. at 593–94. Accordingly, summary judgment will be denied as to count III.

### 3. Count IV.

 Plaintiffs also seek statutory damages of $100 per day for each day that Independence failed to provide requested plan information to Leonard Vogel. Section 104(b)(4) of ERISA, 29 U.S.C. § 1024(b)(4), provides that the plan "administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, plan description...." Independence contends (1) that it was not the "administrator," (2) that the request was not in writing, (3) that the request was not from a participant or beneficiary, (4) that the request was made after the policy had terminated, and (5) that it was practically impossible for Independence to comply with the request because it never possessed a copy of the master policy. None of these assertions provides adequate grounds for a grant of summary judgment.

Under ERISA, if no plan administrator is specifically identified in the plan—and none was here—then the administrator is deemed to be the "plan sponsor." ERISA § 3(16)(A)(ii), 29 U.S.C. § 1002(16)(A)(ii). "Plan sponsor" is itself defined as "the employer in the case of an employee benefit plan established or maintained by a single employer." ERISA § 3(16)(B)(i), 29 U.S.C. § 1002(16)(B)(i). Thus, as a matter of law, it is clear that Independence is properly regarded as the plan administrator for purposes of ERISA § 104(b)(4).

Second, as a factual matter, the Court cannot conclude at this stage that a written request was not made for the plan information. Aradyne Ardister, Independence's employee responsible for managing the plan, asserts in her affidavit that she never received a written request for plan information. *See* Exhibit 11, attached to Independence's Motion for Summary Judgment. Kenneth Vogel, however, has sworn in an affidavit that he spoke on the phone with Ms. Ardister informing her that he was requesting plan information, and that he also sent a letter on January 9, 1986, to Ms. Ardister requesting the information. *See* Tab 42, Exhibits to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (also attached is a copy of the letter). Clearly, a factual dispute exists as to

whether this letter was received; this dispute cannot be resolved by the Court at this stage of the proceedings.

Third, Independence argues, in the alternative, that any request for plan information was not made by a plan participant or beneficiary. Given this Court's prior determination that Kenneth Vogel individually can be regarded as a beneficiary, Independence's argument has little merit. In any event, Kenneth's letter was quite clearly written on behalf of his father.[25] The letter explains, "since [Guardian] is continuing to pay my father's medical bills I feel I should have a copy of the master policy." *See* Exhibit A to Tab 42, Exhibits to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment. Inasmuch as Kenneth was standing in the shoes of his father—a participant of the plan—the request fulfills this aspect of § 104(b)(4), or at least a reasonable jury could so find.

Next, this Court considers Independence's claim that § 104(b)(4) is inapplicable because the request for plan information came after Independence had terminated its relationship with Guardian. As a result, Independence asserts, Aradyne Ardister was no longer the plan's administrator (if she ever was). The plaintiffs do not dispute the relevant facts, but argue that there exists no statutory requirement that the plan be in effect at the time the request is made.

This appears to be a question of first impression under ERISA, complicated by the fact that § 104(b)(4) does not clearly address itself to this issue. Resort, once again, to the definitional section of ERISA provides guidance. Section 3(7) of ERISA, 29 U.S.C. § 1002(7), defines a "participant" as "any employee or *former employee* of an employer ... who is or may become eligible to receive a benefit of any type

from an employee benefit plan...." (emphasis added). Thus, an individual is entitled to receive information on plans that may provide that individual with benefits, even though that individual is no longer an employee. It stands to reason that current employees (or even former employees) should be entitled to receive information on terminated plans that may, despite the plan's termination, provide that individual with benefits. In both situations, there exists the possibility that the plan provides coverage despite a significant change in the relationship between the individual and the plan. The purpose of ERISA § 104(b)(4), quite clearly, is to allow an individual seeking coverage the opportunity to determine whether such coverage exists. This purpose is fulfilled by permitting Kenneth Vogel to request plan information under § 104(b)(4) just a few months after the plan's termination.[26]

Finally, Independence objects to the request for plan information because it claims that it never possessed a copy of the insurance plan at issue in this litigation. Despite the fact that the plan had been in operation since early 1980, Independence asserts in its Memorandum in Support of its Motion for Summary Judgment that "the master policy ... was never provided to Independence Federal and, in fact, was not even assembled until after the instant lawsuit was filed...." *Id.* at 14. Thus, Independence claims that its failure to provide the requested information resulted "from matters reasonably beyond [its] control." ERISA § 502(c)(1), 29 U.S.C. § 1132(c)(1).

Simply put, whether Independence did not, in fact, possess the policy is a matter in dispute; even its co-defendant, Guardian, asserts in its Statement of Undisputed Ma-

---

**25.** At the time the letter was written, the uncontroverted evidence indicates Leonard Vogel was not capable of writing the letter himself.

**26.** This reasoning must not be carried to illogical extremes. If, for instance, the request for plan information were to occur many years after the plan's termination, the former plan administrator quite properly would refuse to provide such information. That decision would

likely be protected under ERISA § 502(c)(1), which absolves an administrator of liability for "reasonable" failures to provide plan information. In the case before the Court, however, the request for plan information came just three months after the employer terminated the plan and while Leonard Vogel was still receiving coverage under the plan.

terial Facts etc., at 4, that "[t]he employer rider was delivered to Independence Federal at the offices of Independence Federal...." Moreover, if, in fact, Independence did not possess a copy of the master policy, whether that was "reasonable" within § 502(c)(1) must be determined by the trier of fact. Quite clearly, an administrator's failure to have a copy of the plan that it is administering is not *per se* reasonable. *See Bova v. American Cyanamid Co.*, 662 F.Supp. 483, 490 (S.D. Ohio 1987) (good faith failure to provide information does not excuse failure); *Chambers v. Kaleidoscope, Inc. Profit Sharing Plan and Trust*, 650 F.Supp. 359, 367–68 (N.D.Ga. 1986). Summary Judgment in favor of Independence on Count IV must, therefore, be denied.

*4. Counts V, VI, and VII.*

In these counts, plaintiffs bring a cause of action against each defendant for breach of fiduciary duty in violation of ERISA § 409, 29 U.S.C. § 1109. Although the specific factual allegations against each defendant differ somewhat, plaintiffs generally assert that each defendant breached both the duty of care imposed upon fiduciaries, ERISA § 404, 29 U.S.C. § 1104, as well as the duty of loyalty, ERISA § 406, 29 U.S.C. § 1106. Before turning to each defendant's individual argument that it cannot be regarded as a fiduciary under ERISA, this Court must consider the contention presented by the Arkin Agency (although applicable to the claims against each defendant) that plaintiffs cannot maintain a § 409 action.

▪ Pointing to the language of § 409, the Arkin Agency contends that plaintiffs cannot bring an action for damages done them individually; that section, the Agency argues, only permits an action for damages done to the plan.[27] Thus, the agency concludes, plaintiffs prayer for "compensatory damages, including out-of-pocket damages, damages for extreme emotional distress, [and] damages for pain, suffering, and wrongful death" must be stricken."

The Supreme Court's opinion in *Massachusetts Mutual*, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 provides partial support to the Arkin Agency's contention. In *Massachusetts Mutual*, the Court considered whether an ERISA fiduciary could be "held personally liable ... for extracontractual compensatory or punitive damages caused by improper or untimely processing of benefit claims." *Id.* at 136, 105 S.Ct. at 3087. The Court, after reviewing the text of the statute and its legislative history, held "that in § 409 Congress did not provide ... a cause of action for extracontractual damages." *Id.* at 148, 105 S.Ct. at 3093. Thus, to the extent that plaintiffs here seek damages for breach of fiduciary duty that are properly characterized as extracontractual, their claims must be discarded as a matter of law. *Massachusetts Mutual*, however, does not support the Arkin Agency's contention that all claims for damages done an individual by breach of fiduciary duty must be dismissed. Damages to an individual that flow directly from such a breach may be recovered.[28]

▪ Despite the Arkin Agency's characterizations, not all of the relief requested

---

**27.** The Arkin Agency relies particularly on language in *Massachusetts Mutual*, where the Supreme Court noted:

[W]hen the entire section is examined, the relationship between the fiduciary and the plan as an entity becomes apparent. Thus, not only is the relevant fiduciary relationship characterized at the outset as one "with respect to a plan," but the potential personal liability of the fiduciary is "to make good *to such plan* any losses *to the plan* ... and to restore *to such plan* any profits of such fiduciary which have been made through use of assets *of the plan*...."

*Id.*, 473 U.S. at 140, 105 S.Ct. at 3089.

**28.** The Arkin Agency, in support of its position, cites this Court's earlier Memorandum and Order which addressed the impact of *Massachusetts Mutual* on plaintiffs' claims for extracontractual and punitive damages. *See* Arkin Agency Memorandum of Law in Support of its Motion for Summary Judgment at 28. In that earlier Memorandum and Order, this Court characterized *Massachusetts Mutual* as holding that under § 502(a)(2) "an individual may only bring a section [509] suit to recover damages on behalf of the plan not damages he himself has incurred." *Vogel*, 692 F.Supp. at 595. This was an overbroad statement of the holding in *Massachusetts Mutual*, and the Court expressly disavows it.

by plaintiffs in Counts V, VI, and VII is extracontractual. Rather, plaintiffs' prayer for recovery of "out-of-pocket" expenses incurred as a result of a breach of fiduciary duty may be maintained since such damages flow directly out of the claimed breach of fiduciary duty. Plaintiffs' simply assert that the termination of Leonard Vogel's coverage and the refusal to allow him to convert breached each defendant's fiduciary duty and directly caused the plaintiffs to expend money to care for Leonard Vogel. The damages complained of are the proximate result of the alleged breach of fiduciary duty. Inasmuch as they are not extracontractual, they may be recovered. Plaintiffs' other prayers for relief, in contrast, are properly characterized as seeking extracontractual damages and, therefore, are properly objected to by defendants. Summary judgment on those prayers will be granted.

As noted above, each defendant also contends that it is not subject to ERISA's fiduciary duty standards. Each asserts that the definition of fiduciary in ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), does not encompass them, and, even if it does, that they breached no duty.[29] Reviewing each defendant's relationship to the plan as well as each defendant's alleged behavior, it is clear that summary judgment on the breach of fiduciary duty counts is not appropriate.

In Count V, plaintiffs allege that Independence breached its fiduciary duty by cancelling the Guardian policy—and hence Leonard Vogel's coverage—simply to save money at the Vogel family's expense. Moreover, plaintiff's claim that this action was taken for retaliatory and malicious reasons.[30] Independence maintains that it was not a fiduciary and, in any event, its decision to terminate the entire Guardian plan, rather than one specific individual's coverage, insulates it from a § 509 claim. *See District 65, UAW v. Harper and Row, Publishers, Inc.*, 576 F.Supp. 1468 (S.D.N.Y.1983)

Independence's contention that it cannot be regarded as a fiduciary is completely unfounded. As noted above, *see supra* p. 32, Independence is properly deemed the plan administrator pursuant to ERISA §§ 3(16)(A)(ii) & (B)(i). As the administrator, it owes a fiduciary duty to the plan and its participants. ERISA § 3(21)(A)(iii); *see Firestone Tire*, 109 S.Ct. at 951 ("By operation of law, [employer] itself was the administrator and fiduciary of each of these ... plans") (citations omitted). Moreover, Independence's argument that it breached no fiduciary duty because it terminated the coverage for all its employees when it dropped the Guardian plan is equally unpersuasive. The facts as alleged indicate that Independence did not terminate coverage for all employees, but decided to terminate coverage for one particularly burdensome employee. Thus, whatever protection ERISA affords a decision to drop coverage for all employees has no applicability here. On the contrary, the facts as alleged by plaintiffs bring Independence's actions within the scope of ERISA § 404(a)(1)(A)(i), which demands that "a fiduciary shall discharge his duties with respect to a plan solely in the interests of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries." Summary judgment in favor of Independence must be denied.

In Count VI, plaintiffs claim that Guardian breached its fiduciary duty

---

**29.** ERISA § 3(21)(A) defines, in pertinent part, a plan fiduciary as a person who "(i) ... exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of assets, [or] ... (iii) ... has any discretionary authority or discretionary responsibility in the administration of such plan." As this Court noted previously, "[i]n drafting ERISA, ... Congress took a broad view of who could be considered fiduciaries...." *Vogel*, 692 F.Supp. at 593.

**30.** Plaintiffs allege that the termination of Leonard Vogel's coverage was in retaliation for Vogel's "outspoken criticism" of the relationship between the Bank and Effie Barry, the wife of District of Columbia Mayor Marion Barry. *See* Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment at 42 & n. 90.

by causing Leonard Vogel to lose his health insurance benefits and preventing him from converting to an individual policy. Like Independence, Guardian first claims that it cannot be deemed a fiduciary under ERISA. It is clear, however, that Guardian possessed the authority to grant or deny Leonard Vogel's request to convert to an individual policy; Guardian interpreted the policy terms and rendered its disputed decision. Thus, it falls within the definition of fiduciary under ERISA §§ 3(21)(A)(i) & (A)(iii). Moreover, this Court cannot conclude—given the state of the factual record—that Guardian did not violate its duty. What is, perhaps, the central "fact" in this litigation remains in serious dispute: whether the Guardian policy permitted Leonard Vogel to convert to an individual policy. The plaintiffs point to the terms contained in the benefits booklet provided by Guardian; Guardian points to the policy itself. In retort, the plaintiffs raise serious doubts as to the authenticity of the policy produced by Guardian. *See supra* note 6. Given this factual dispute, this Court will deny summary judgment as to Count VI.

Finally, plaintiffs allege, in Count VII, that the Arkin Agency breached its fiduciary duty by participating in—indeed, orchestrating—the termination and reinstatement of the Guardian policy. These actions, plaintiffs' assert, were taken in order to save money for Independence and Guardian and out of a desire to obtain future business from Guardian; they were not undertaken, plaintiffs allege, "solely in the interest of" Leonard Vogel. ERISA § 404(a)(1). The Agency strenuously denies that it could be construed as a fiduciary under ERISA § 3(21)(A). It argues that the purposes of ERISA would be subverted to hold that insurance agencies are bound by ERISA's fiduciary duty provisions simply because those agencies offer advice to clients regarding ERISA-regulated plans. *See American Federation of Unions v. Equitable Life Assurance Society*, 841 F.2d 658, 664 (5th Cir.1988); *Anoka Orthopaedic Associates, P.A. v. Mutschler*, 709 F.Supp. 1475, 1485 (D.Minn. 1989). As a general matter, the Agency is quite correct. But what plaintiffs allege

here is that the Arkin Agency, because of its unusually intimate relationship with the Bank's Board of Directors, was not simply an independent advisor. Rather, the Bank's Board relied upon the discretionary judgment offered by the Arkin Agency—the Board Chairman's insurance agency—in deciding to terminate and subsequently reinstate the Guardian policy. The factual record viewed in a light most favorable to plaintiffs supports these allegation. Given that backdrop, this Court cannot conclude that the Arkin Agency, as a matter of undisputed fact and law, did not exercise "any" discretionary authority with respect to the termination of Leonard Vogel's health insurance. ERISA § 3(21)(A)(i).

Whether plaintiffs adequately state a claim for breach of fiduciary duty by the Arkin Agency need not detain the Court long. As with Independence and Guardian, the allegations against the Agency clearly are sufficient to carry the issue to the trier of fact. If, for instance, the Agency indeed offered the advice that it did in order to become a General Agent for Guardian, a jury could quite properly find that the Agency breached its ERISA-imposed fiduciary duty. Accordingly, summary judgment in favor of the Arkin Agency on Count VII will be denied.

### 5. Count VIII.

In this Count, plaintiffs bring a claim for common law promissory estoppel. They claim that they reasonably relied to their detriment on representations of all three defendants that Leonard Vogel would continue to receive health insurance benefits. Plaintiffs assert that they were injured by such misrepresentations in that Irene Vogel, Leonard Vogel's wife, "passed up the chance to enroll Leonard Vogel on the Blue Cross/Blue Shield plan for health insurance for herself and her family when she had the opportunity to do so on open season, without providing evidence of insurability." *See* Plaintiffs' Memorandum in Opposition to Defendants' Motions for Summary Judgment at 54. Consequently, when Leonard Vogel's benefits were termi-

nated, the family was forced to bear the cost of his medical care.

In a previous Memorandum and Order, this Court concluded that "since estoppel is an equitable doctrine, and 29 U.S.C. § 1132(a) specifically grants equitable powers, estoppel is an appropriate theory for recovery of benefits from an ERISA employee benefits plan." *Vogel,* 692 F.Supp. at 594. Defendants' challenge this conclusion, arguing that the statutory requirement that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument" precludes an action for promissory estoppel. ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). Since the Court did not directly address this legal objection to plaintiffs' estoppel claim in its previous ruling, it will address that claim here.

Other courts have split on the question of whether ERISA § 402(a)(1) precludes an action for estoppel. *Compare Torrence v. Chicago Tribune Co.,* 535 F.Supp. 748 (N.D.Ill.1982) (allowing a claim for estoppel to go to the jury), *with Saret v. Triform Corp.,* 662 F.Supp. 312 (N.D.Ill.1986) (explicitly departing from the conclusion reached in *Torrence* ). Courts that have refused to permit estoppel claims generally cite Congress' desire for certainty, expressed in the writing requirement of ERISA § 402(a)(1), as mandating their decision. The court in *Musto v. American General Corporation,* 861 F.2d 897, 910 (6th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989), offered the following rationale:

> It is not always easy to determine exactly what a benefit plan says even when the language of the plan has been reduced to writing. If the terms of these often complex plans could be made to depend upon evidence as to oral statements that may not have been worded very precisely in the first place, that may have been made many years earlier, and that cannot be proved except through the testimony of lay witnesses whose memories will seldom be infallible and who, being human, may have tended to hear what they wanted to hear, the degree of

certainty that Congress sought to provide for would be utterly impossible to attain.

*See also Saret,* 662 F.Supp. at 316 ("The writing requirement ... secures to the plan's participants and administrators a clear understanding of their rights and obligations").

This Court concurs with the reasoning expressed in *Musto* and *Saret.* That reasoning, however, does not lead this Court to conclude that plaintiffs' estoppel claims must be rejected. Both *Musto* and *Saret* involved particular benefits that plaintiffs alleged that they were entitled to because of the oral representation of plan administrators. The courts concluded, quite properly, that the terms of the benefits plan could not be varied by oral representations while still maintaining the certainty and integrity of the plan itself. Employee benefits plans tend to be enormously complex and involved, and to allow oral modification of the plan's terms would create chaos. This reasoning does not extend, however, to far less complex question of whether an individual is covered by the plan and whether that coverage will continue. Unlike the question of the specifics of a plan's terms, the question of an individual's coverage admits of only two possible answers: either the individual is covered or he is not. That is, the answer is either "yes" or "no". The potential for chaotic and conflicting interpretations of the plan's terms simply does not arise in such a situation. Accordingly, the dangers that ERISA § 402(a)(1) sought to avoid by mandating that the plan's terms be in writing are not presented.

The court in *Torrence, supra,* faced with a case presenting very similar facts, reached the same conclusion. There, the plaintiff sought coverage under an ERISA-regulated pension plan. The defendant had denied the plaintiff coverage because of the plaintiff's seven-year break in service with the company. The plaintiff claimed that the defendant was estopped from denying him benefits because he relied on the defendant's assurances that taking a job with an affiliated company would not constitute

a break in service rendering him ineligible for pension benefits. The court concluded that "if ... officials are permitted to affirmatively mislead current participants in this manner, the fiduciary duty to provide pension benefits to those participants constitutes nothing more than a hollow formalism." *Id.* at 750. Similarly, if the defendants here are allowed to disavow their assurances to Irene Vogel that her husband would receive continued coverage under the Guardian plan, then their fiduciary duty would amount to "nothing more than a hollow formalism." Thus, this Court finds that, under the facts as alleged here, a claim for estoppel may be maintained.

■■■■ Whether plaintiffs allege sufficient facts to sustain a cause of action for promissory estoppel has, for the most part, already been addressed. The elements of an estoppel claim are familiar. If a fraudulent promise is made as to some future event that the promisor anticipates will result in detriment to the promisee, and reasonable reliance on that promise does result in injury, then a claim for promissory estoppel may be brought. *See Snyder v. Snyder,* 79 Md.App. 448, 459, 558 A.2d 412, *cert. denied,* 317 Md. 511, 564 A.2d 1182 (1989); *Learning Works, Inc. v. The Learning Annex,* 830 F.2d 541, 545 (4th Cir.1987). Here, the facts as developed in discovery certainly suffice to support a claim for promissory estoppel.[31] Summary judgment in favor of defendants will be denied on the estoppel claim.

### 6. Count IX.

■■■ In conjunction with their various ERISA claims, plaintiffs also bring a claim for common law conspiracy.[32] Under Maryland law, "a civil conspiracy is a combination of two or more persons by an agreement or understanding to accomplish an unlawful act ... with the further require-

ment that the act ... must result in damages to the plaintiff." *Green v. Washington Suburban Sanitary Comm'n,* 259 Md. 206, 269 A.2d 815 (1970). Given the facts as alleged and the arguable violations of ERISA detailed above, this Court has no difficulty in concluding that plaintiffs state a cognizable claim for common law conspiracy. The nub of the plaintiffs' complaint is that Independence, upon the advice of its Board Chairman Rudolph Arkin, who also is a principal in the Arkin Insurance Agency, determined to cut off Leonard Vogel's health insurance in violation of ERISA and non-preempted state law, and that this was accomplished with the assistance of Guardian and its employee, Eugene Youngentob. All three defendants are tied together in this allegation; these allegations, if true, state a claim for conspiracy. Summary judgment on the plaintiffs' conspiracy count will be denied.

### 7. Count X.

In the final count of the Third Amended Complaint, plaintiffs' seek indemnification from the Arkin Agency and Independence if plaintiffs are found liable on Guardian's counterclaim. As discussed next, this Court will grant summary judgment to the plaintiffs on Guardian's counterclaim. Accordingly, plaintiffs' cause of action for indemnification is deemed moot.

### IV. Plaintiffs' and Guardian's Cross-Motions for Summary Judgment on Guardian's Counterclaim

■■■ On August 18, 1988, Guardian filed a counterclaim in which it sought to recover monies paid on behalf of Leonard Vogel by Guardian. The heart of the counterclaim is the contention—advanced by all defendants—that Leonard Vogel was never entitled to be covered by the health benefit plan purchased by Independence because

---

**31.** Defendants major attack on the sufficiency of plaintiffs' allegations of promissory estoppel concern the reasonableness of the plaintiffs' reliance on each defendants representations. Inasmuch as this Court has previously found that each defendant could properly be regarded as a fiduciary for ERISA purposes, *see supra* at 1228–1230, any reliance would have been, at least

arguably, reasonable. *See Cleary v. Graphic Communications Int'l Union,* 841 F.2d 444, 447 (1st Cir.1988) ("[t]he representations relevant to the estoppel theory must be made by someone with authority to bind the" plan).

**32.** As noted above, *see supra* at 1222, this claim is not preempted by ERISA.

he was not a *bona fide* full-time employee of Independence. Rather, Guardian asserts that "the undisputed fact is that as a favor to Leonard Vogel, and at Leonard Vogel's request, Independence Federal included Leonard Vogel on the Independence Federal group insurance policy beginning in approximately 1975." Memorandum of Guardian in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Guardian's Cross–Motion for Summary Judgment on Guardian's Counterclaim at 5. Since the policy, by its terms, extends coverage only to full-time Independence employees,[33] Guardian asserts that any claims it paid to cover Leonard Vogel's medical expenses were erroneously paid and should be refunded.

Plaintiffs, in their cross-motion, set out a number of reasons why they should be granted summary judgment on the counterclaim. The central contention, and the contention that this Court finds persuasive, is that the incontestability clause contained in the Guardian policy precludes Guardian from asserting, at this late date, that Leonard Vogel was never entitled to receive coverage under the Guardian policy. Because of the operation of the incontestability clause, whether Leonard Vogel properly qualified for coverage under the Guardian policy when the policy was instituted in 1981 is completely irrelevant at this point. Guardian failed to contest Vogel's eligibility within the time limits prescribed by its the incontestability clause; hence, Guardian cannot, as a matter of law, attempt now to recover monies paid on Vogel's behalf.

The undisputed facts material to this Court's determination that plaintiffs are entitled to judgment as a matter of law on Guardian's counterclaim are not complicated. On January 1, 1981, the health insurance policy provided to Independence employees was picked up by Guardian. This policy contained a standard two-year incontestability clause.[34] All those previously covered by the New England Life policy were henceforth covered by the Guardian policy. Independence paid premiums to Guardian, as it had to New England Life, on behalf of all those listed as insureds, including Leonard Vogel. When Leonard Vogel suffered his debilitating stroke on June 29, 1982, Guardian began honoring claims made on his behalf for health care costs. These claims were paid by Guardian until November 1, 1986, a year after the termination of the Guardian policy, when the extension of benefits provision of that policy expired. Guardian does not allege that it ever disputed the eligibility of Leonard Vogel to health insurance benefits under the plan until the counterclaim was filed, over seven-and-half-years after the policy went into effect.[35]

Incontestability clauses exist to benefit insureds and their beneficiaries. *Mutual Life Ins. Co. of New York v. Hurni Packing Co.*, 263 U.S. 167, 44 S.Ct. 90, 68 L.Ed. 235 (1923). They are inserted into insurance policies by the drafter—the insurer—as an inducement to purchase the insurance. The long history of case law regarding these clauses has been to uphold them and construe them strictly. *See, e.g., Guardian Life Ins. Co. of America v. Schaefer*, 70 N.Y.2d 888, 524 N.Y.S.2d 377,

---

**33.** *See* Statement of Undisputed Material Facts and Exhibits of Co–Defendant the Guardian Life Insurance Company of America in Support of Motion for Summary Judgment at tab 12.

**34.** The incontestability clause contained in the Guardian policy provides:
Incontestability: This Policy shall be incontestable after two years from its date of issue except for nonpayment of premiums.
The insurance on any Employee shall be incontestable after it has been in force for two years during his lifetime, except for violation by the Employee of the conditions, if any, of this Policy relative to military or naval service.

*See* Statement of Undisputed Material Facts and Exhibits of Co–Defendant the Guardian Life Insurance Company of America in Support of Motion for Summary Judgment at tab 12.

**35.** Guardian admitted, in response to plaintiffs' requests for admissions, that it received all premiums due under the policy and that it did not challenge Leonard Vogel's eligibility to receive coverage under the policy prior to January 1, 1983. *See* Plaintiffs' Supplemental Opposition to Guardian's Motion for Summary Judgment on the Counterclaim at 2 (responses to requests for admissions, nos. 54 & 56).

519 N.E.2d 288 (1987); *Hulme v. Springfield Life Ins. Co.*, 565 P.2d 666 (Okla. 1977); *Freed v. Bankers Life Ins. Co. of Nebraska*, 216 N.W.2d 357 (Iowa, 1974); *Simpson v. Phoenix Mutual Life Ins. Co.*, 24 N.Y.2d 262, 299 N.Y.S.2d 835, 247 N.E.2d 655 (1969); *Poffenbarger v. New York Life Ins. Co.*, 277 F.Supp. 726 (S.D. W.Va.1967). If the insurer fails to discover facts that would permit it to avoid payment on the insurance within the time limit specified in the incontestability clause, and absent any acts by the insured that would have prevented discovery of such facts, the insurer may not disclaim liability. *See Stiegler v. Eureka Life Insurance Co. of Baltimore*, 146 Md. 629, 638, 127 A. 397 (1925) ("The law is definitely settled by the clear weight of authority that a life insurance policy may establish a reasonable period of limitation ... within which the insurer must discover and assert such defenses to the policy as may exist"). This principle is applicable to all manner of conditions of insurance, including the employment status of a purported insured. *See Simpson, supra* (incontestability clause bars an out-of-time challenge based on the employment status of insured).[36]

Here, there is no reason why Guardian could not have discovered the facts of Leonard Vogel's employment within the two years allotted in the incontestability clause. If, in fact, Leonard Vogel was not entitled to be on the Guardian plan, Guardian could have acted to remove him from coverage.[37] The counterclaim, however, was filed seven-and-a-half years after the insurance went into effect, which is five-and-a-half years after time expired for Guardian to contest Leonard Vogel's eligibility. Guardian's counterclaim is patently without merit. Summary judgment on Guardian's counterclaim must be granted to plaintiffs.[38]

Accordingly, it is this 3rd day of January, 1990, by the United States District Court for the District of Maryland,

ORDERED:

36. In *Fisher v. United States Life Insurance Co. in City of New York*, 249 F.2d 879 (4th Cir.1957), the Fourth Circuit relied on then-current New York law to draw a distinction between "conditions of insurance" and "limitation of the risk" as it pertained to a proposed insured's employment status. When considering group insurance, the court held, the incontestability clause did not bar an out-of-time challenge by the insurer based on the claimant's employment status. The court determined that since the claimant was not a member of the contemplated pool of insureds because he was not a full-time employee of the subscriber, enforcing the incontestability clause would increase the risk to the insurer and would be contrary to New York law. The case law that the Fourth Circuit relied on in reaching that decision in *Fisher* was effectively overruled in *Simpson, supra*. In *Simpson*, the New York Court of Appeals held that, under New York law, employment status was a "condition of employment" that falls within the ambit of an incontestability clause. *Id.*, 24 N.Y.2d at 266–67, 299 N.Y.S.2d 835, 247 N.E.2d 655. Thus, the basis for the Fourth Circuit's holding in *Fisher* has been removed by the highest court in New York, rendering *Fisher* essentially irrelevant.

Furthermore, this Court notes that, as a matter of pure economics, it makes little sense to distinguish between conditions of insurance (e.g., the health of the proposed insured) and limitations of the risk (e.g., whether the proposed insured falls within the contemplated class of insureds). In either case, a misstate-

ment by the proposed insured of his status, whether it pertained to his poor health or his failure to come within the contemplated class, increases the likelihood that the insurer will have to pay a claim. In both instances, if the insurer is able to discover the misstatement within the incontestability period, there is no actuarial reason to distinguish between the two misstatements.

37. The Court notes that it offers no opinion on the factual dispute regarding Leonard Vogel's employment status here. Whether Leonard Vogel was, indeed, technically eligible to be included on the Guardian plan is not material to this Court's determination that the incontestability clause of the policy entitles the plaintiffs to summary judgment on Guardian's counterclaim. Since the dispute of fact is not material to the this determination, it does not prevent a grant of summary judgment.

38. The relevant law regarding incontestability clauses does not vary among Maryland, Rhode Island, and the District of Columbia. *See Stiegler, supra; Holtze v. The Equitable Life Assurance Society of the U.S.*, 276 Md. 681, 351 A.2d 139 (1976); *Murray v. State Mutual Life Ins. Co.*, 22 R.I. 524, 48 A. 800 (1901); *Klanian v. New York Life Ins. Co.*, 68 R.I. 126, 26 A.2d 608 (1942); *Manufacturer's Life Ins. Co. v. Capital Datsun, Inc.*, 566 F.2d 354 (D.C.Cir.1977); *Westhoven v. New England Mutual Life Ins. Co.*, 384 A.2d 36 (D.C.App.1978).

1. That defendants' motions for summary judgment on the Third Amended Complaint are DENIED, with the following exceptions:

a. That summary judgment in favor of defendants will be GRANTED as to the prayers for extracontractual damages in Counts V, VI, VII; and

b. That Count X of the Third Amended Complaint is deemed MOOT;

2. That plaintiffs' motion for summary judgment on Guardian's counterclaim is GRANTED;

3. That Guardian's motion for summary judgment on its counterclaim is DENIED.